Elizabeth STROOT, et al., Plaintiff,

v.

NEW HAVERFORD PARTNERSHIP,
et al., Defendant.

C.A.No. 95C–05–074HLA.

Superior Court of Delaware,
New Castle County.

Submitted: June 2, 1999.
Decided: Aug. 17, 1999.

Susan L. Parker, Esquire, Smith, Katzenstein & Furlow, LLP, Wilmington, for Plaintiffs.

Guy Keith Vann, Esquire, New York, N.Y., Attorney for Plaintiffs.

James F. Kipp, Esquire, and William Doehler, Esquire, Trzuskowski, Kipp, Kelleher & Pearce, P.A., Wilmington, for Defendant.

## *OPINION*

ALFORD, J.

### I. *Background*

This is a civil action for damages brought by plaintiffs Elizabeth Stroot ("Stroot"), Joletta Watson ("Watson") (collectively, "Plaintiffs"), Lois Schindler, Angela McCarthy, and others against the defendants, New Haverford Partnership, et al., ("Defendants"), arising out of injuries sustained by Plaintiffs due to unsanitary and unhealthy living conditions at Haverford Place Apartments ("Haverford Place") in Mill Creek Hundred, New Castle County, Delaware.

On May 11, 1999, following more than two weeks of trial, a jury awarded Stroot damages in the amount of $1,000,000 and $40,000 to Watson. The jury also awarded damages for expenditures necessary to obtain adequate substitute housing in the amount of $5,000 to Stroot, $1,500 to Angela McCarthy, and $3,700 to Lois Schindler. Before the Court is Defendants' motion for remittitur and relief from the jury verdict, pursuant to Superior Court Civil Rule 59(d), contending that the damages award to plaintiffs Stroot and Watson is speculative and that it is so excessive that it should shock the judicial conscience.

### II. *Defendants' Motion for Remittitur Related to Stroot*

Defendants move this Court for remittitur arguing that the $1,000,000 jury verdict to Stroot is grossly excessive. Defendants' argument is twofold: That Stroot's damages were not proven to a reasonable probability, and that the award was so excessive to shock the Court's conscience. Defendants first argue that although there was evidence from which the jury could have awarded Stroot damages related to the aggravation of her allergies and her asthma while she resided at Haverford Place, any damages related to future pain regarding her worsened asthma, increased risk of broken bones, and increased risk of tuberculosis were too speculative in nature for the jury to award such damages.

Defendants argue that there was no evidence from which the jury could determine how much worse Stroot's asthma actually was on a permanent basis. Defendants further aver that there was no evidence from which the jury could determine the extent to which Stroot's condition was caused by having lived at Haverford Place, and not by her other allergies. Defendants argue that the jury was not provided adequate information to determine the extent of Stroot's increased risk of developing tuberculosis because the only evidence Stroot provided was that she had been exposed to the disease in a setting outside of Haverford Place. Defendants also argue that the evidence did not indicate the extent to which Stroot's risk of developing active tuberculosis increased as a result of her increased prednisone usage. Therefore, Defendants argue, any future damage award was based on speculation.

In regards to Stroot's osteopenia, Defendants contend that the medical evidence provided by Stroot's physician, Dr. Cecile Rose, was not specific enough to support an award of damages. Defendants contend that Dr. Rose's testimony merely indicated that Stroot had osteopenia and that the osteopenia was probably related to her steroid use while living at Haverford Place. On this issue, Defendants finally contend that the jury was not provided sufficient information to determine future damages because Dr. Rose did not indicate the extent to which Stroot's risk of developing osteopenia was a result of her increased steroid use related to Haverford Place, as compared to the risk of developing osteopenia outside of having lived at the apartment complex.

Turning to Defendants' argument that the award was excessive and should shock the Court's conscience, Defendants argue that such remittitur is warranted based on the disparity between the nature of the Stroot's injuries and the jury award. Defendants maintain that while the jury could have reasonably awarded Stroot the medical expenses she incurred, $28,810.39, for aggravation of her allergies and asthma while she lived at Haverford Place, and "a mild decrease in her cognitive functioning," there was no basis on which the jury could have determined to what degree her asthma was permanently worsened. Defendants further argue that this verdict should shock the Court's conscience because there was no evidence that Stroot would suffer future medical costs as a result of her worsened condition and that there was no evidence that Stroot would suffer loss of earning capacity because of her cognitive deficiencies.

## III. DEFENDANTS' MOTION FOR REMITTITUR RELATED TO WATSON

Defendants also ask for a remittitur regarding the jury award to Watson in the amount of $40,000. Defendants argue that such remittitur is warranted based on the disparity between the nature of Watson's injuries and the jury award, and that the award should shock the Court's conscience. Defendants maintain that between November 1, 1990 to October 31, 1994, the period during which Watson lived at Haverford Place, she had only one visit to her doctor for bronchitis and that she was treated with antibiotics for this condition.

Defendants also argue that Watson did not see her private physician for her bronchitis but instead, only visited Dr. Echardt Johanning in May 1996, who diagnosed her with recurrent bronchitis and sinusitis based solely on her subjective complaints. Defendants claim that Dr. Johanning ignored Watson's testimony that she had fully recovered approximately six months after leaving Haverford Place, and that Dr. Johanning's physical exam, chest x-rays, and pulmonary function testing on May 14, 1996 revealed no abnormal findings. Defendants' contention is that Watson's bronchitis was treated with an occasional use of antibiotics prescribed by her primary care physician and that there was no claim for past or future medical expenses and lost income.

## IV. DISCUSSION

 The presumption in Delaware is that a jury verdict is "correct and just."[1] A Motion for Remittitur under Superior Court Civil Rule 59 may be granted by the trial court following a jury trial only with

1. *See Wells v. Clayton Homes, Inc.*, Del.Super., C.A. No.:93C–07–023, Graves, J., 1995 WL 160932 (Mar. 22, 1995).

great reluctance.[2] This Court has the authority to grant a new trial if it finds that the verdict is based upon "passion, partiality, prejudice, mistake or misapprehension on the part of the jury."[3] It has also been held that a verdict will not be set aside unless it is "so grossly excessive as to shock the Court's conscience and sense of justice; and unless the injustice of allowing the verdict is clear."[4]

■ Therefore, "barring exceptional circumstances, a trial judge should not set aside a jury verdict on such ground unless ... the evidence [weighs] so heavily against the jury verdict that a reasonable jury could not have reached the result."[5]

By way of background, Plaintiffs filed a lawsuit against Defendants alleging that they were exposed to various mycotoxins, bacteria, fungi, and other toxic substances while they lived at Haverford Place Apartments. Plaintiffs alleged that as a result of their exposure to various toxic substances at the apartment complex, they sustained serious and personal injuries; suffered mental and emotional injuries; were required to seek medical care and hospitalization, and will be required to seek further medical care in the future; were incapacitated from attending to their usual duties; and that they sustained economic losses.

In awarding Plaintiffs compensation for their injuries, the jury found that Defendants violated the New Castle County Housing Code; that Defendants violated the Landlord–Tenant Code, § 5303(a)(1)-(5); and that Defendants were negligent under the common law. The jury also found that Defendants breached the lease agreement with Stroot and two other plaintiffs. The jury attributed 22% contributory negligence each to Stroot and Watson. The jury awarded Stroot $1,000,000 and Watson $40,000 for their personal injuries, including medical expenses, permanent impairment, and pain and suffering. The jury did not award punitive damages to either Stroot or Watson.

■ The crux of Defendants' contention is that the medical and scientific evidence presented by Stroot regarding her asthma, osteopenia, tuberculosis, and decrease of her cognitive functioning was speculative. This case presented a mixture of objective medical and scientific findings as well as subjective complaints. The Court must review the evidence in the light most favorable to Plaintiffs since the verdict was in their favor. This Court is satisfied that the jury could reasonably believe the following set of facts. Cecile Rose, M.D., an expert in the area of occupational and environmental lung diseases, and who testified on behalf of Plaintiffs, stated that asthma is an inflammation of the airways or of the bronchial tubes that is manifested by symptoms of wheezing, cough, chest tightness, and shortness of breath, and which is associated with reversible airflow obstruction. The environment can affect

**2.** See Servino v. Medical Center of Delaware, Inc., Del.Super., C.A. No. 94C–08–077–WTQ, (Quillen, J.), 1997 WL 528263 (Aug. 1, 1997), at *1 (citing Burns v. Delaware Coca–Cola Bottling Co., Del.Super., 224 A.2d 255, 256 (1966)).

**3.** See Telenczak, 345 A.2d at 426. See also Storey v. Castner, Del.Supr., 314 A.2d 187, 193 (1973); McCloskey v. McKelvey, Del.Super., 174 A.2d 691, 693 (1961).

**4.** See Riegel v. Aastad, Del.Supr., 272 A.2d 715, 717–718 (1970). See also Mills v. Telenczak, Del.Supr., 345 A.2d 424, 426 (1975).

**5.** See Gannett Co., Inc. v. Re, Del.Supr., 496 A.2d 553, 558 (1985) (citing Storey, 401 A.2d at 465).

persons who already have asthma by either worsening their condition and at times even causing them to develop other types of asthma. According to the doctor's testimony, asthma can be triggered by exposure to excessive or atypical mold, and that a person exposed to such mold can develop recurrent acute and chronic manifestations of asthma.

Dr. Rose further testified that antigens initiate and propagate an immune reaction in the human lung. She testified that molds such as Penicillium, Stachybotrys, and Aspergillus are capable of functioning as antigens by initiating the lung's immune system by creating inflammatory reactions. Discussing the medical treatment available for asthma, Dr. Rose stated that an asthmatic person is typically treated with corticosteroid, an anti-inflammatory medication, which is inhaled to prevent the inflammation of the bronchial tube. Dr. Rose further stated that other inhalers include beta-agonists, which are muscle relaxers, and also, mast cell stabilizers, which also prevent bronchial inflammation.

Dr. Rose testified that there are several oral medications available for treating asthma, among which are oral corticosteroids, which are also powerful anti-inflammatory drugs. A person with a very diminished airflow is typically given prednisone, an oral corticosteroid, in order to open the air passage. Corticosteroids are also administered intravenously to persons who are severely symptomatic and functionally impaired by their asthma. Discussing some of the side effects of oral and intravenous steroids, Dr. Rose testified that these side effects include the osteoporotic and osteopenic effects of steroids, i.e., bones become brittle and breakable because of the depletion of calcium.

Dr. Rose testified that she evaluated Stroot after she was referred to her by Dr. Johanning. Stroot had a history of childhood allergies and asthma, and received allergy shots which were discontinued in high school when her symptoms diminished. Stroot continues to be allergic to a variety of allergens, including cat and dog hair, dirt, cold, grass, and pollen. Dr. Rose also testified that Stroot smoked cigarettes intermittently and sporadically in the past few years.

The Court is satisfied that the jury could reasonably conclude that Stroot noted a worsening of her asthma symptoms after she moved to Haverford Place in August, 1992. After she moved to the apartment complex, Stroot made more emergency department visits and was hospitalized twice in that year. During her stay at the apartment complex, Stroot received intravenous steroids on at least twelve separate occasions. Further, there was testimony that Stroot's treatment for asthma while at Haverford Place was significantly greater than it had been before moving in or since moving out.

Stroot also had to purchase a nebulizer machine that is used to deliver inhaled medications more efficiently. The jury was informed that in May, 1994, Stroot suffered an asthma attack. Stroot testified that the bathroom ceiling collapsed; that there was a nauseating stench; and that there were mold of varying colors on the ceiling beams. The morning after Stroot noticed leaking of moldy water in her bathroom, Stroot's asthma peak-flow registered at one hundred. The peak-flow meter allows asthmatic persons to monitor their airflow and a reading of one hundred or below requires immediate attention. Such a reading means that the asthmatic person needs immediate medical attention because of possible and impending respiratory failure. Stroot's symptoms improved after she moved out of Haverford Place on

May 17, 1994, however, she continued to require frequent prednisone bursts.

In 1996, while working at the Buffalo V.A. Hospital, following a PPD skin test, Stroot was found to have been exposed to tubercle bacillus, the organism which causes tuberculosis. She was thereafter briefly placed on a medication called INH but was taken off INH because of its side effects. During a December 1997 visit with Dr. Rose, Stroot complained of wheezing, shortness of breath, coughing, chest congestion, nocturnal awakening due to asthma, fatigue, and cognitive impairment. Dr. Rose's examination revealed that Stroot had significant asthma, and that her chest x-rays showed the thickening of her bronchial wall, which is related to a chronic asthma condition.

Dr. Rose testified that she concluded that Stroot's respiratory problems were related to her exposure of excessive and/or atypical microbial contaminants such as Penicillium and Aspergillus during her residence at Haverford Place. Dr. Rose reached this conclusion because of the excessive water intrusion into Stroot's apartment; the observation of visible mold and mildew contamination in the apartment; and, the aerosol testing performed by Dr. Johanning and Dr. Chin S. Yang. Dr. Rose stated that the results of the aerosol testing were significant because there was increased levels of both bacteria and fungi in indoor spaces at Haverford Place.

The jury obviously accepted Dr. Johanning's and Dr. Rose's medical testimony in this case that despite other triggers which could cause her to have an asthma attack, Stroot's asthma was nevertheless significantly exacerbated or worsened by her exposure to microbial contamination at the apartment complex, and that her need for medication increased significantly after she moved to Haverford Place. The Court is satisfied that Stroot showed to a reason-able degree of medical probability that her asthma symptoms decreased, but did not return to her pre-exposure baseline, after she left the apartment complex.

The Court notes that the scientific evidence provided by Dr. Chin Yang regarding the microbial contamination at Haverford Place was not rebutted by Defendants at trial. It is apparent that the jury accepted Dr. Yang's testimony that the extent of water damage he observed in Plaintiffs' apartments made it probable that microbial contamination was widespread and pervasive. Dr. Yang, a mycologist and microbiologist, testified that the water damage at Haverford Place produced excessive mold growth. He also testified that laboratory tests showed the presence of allergenic fungi including Stachybotrys chartarum, Chaetomium globosum, Acremonium, Aspergillus, Aspergillus versicolor, Penicillium, Hansfordia, and Rhodotorula. Dr. Yang further testified that some fungi are known to produce microtoxins such as Aflatoxin, Cyclosporine, and Trichothecenes, which are known to cause serious illnesses, including interfering with the immune system.

The Court also finds that the medical and scientific evidence presented at trial established to the Court's satisfaction that Stroot showed to a reasonable degree of medical probability that her osteopenia is causally related to her increased steroid use not only while living at Haverford Place, but also after she moved out. The evidence presented at trial also showed that Stroot's increased need for steroids to suppress the asthma has increased her risk for developing active tuberculosis.

Further, the jury may have also chosen to accept Dr. Wayne Gordon's testimony. Dr. Gordon, who testified on behalf of Stroot, stated that to a reasonable degree of medical probability, Stroot's cognitive deficits in three areas-attention, concentra-

tion, and executive functioning, were proximately caused by her long-term exposure to microbial contamination at Haverford Place.

 Turning to Defendant's motion for remittitur from the jury verdict in favor of Joletta Watson, the Court finds that the verdict in favor of Watson was supported by the evidence presented at trial. Dr. Johanning, who testified on behalf of Watson, stated that antibody marker and immune system studies showed that Watson had a positive IgE, indicating the development of a permanent mold allergy. Dr. Johanning opined to a reasonable degree of medical probability that Watson developed significant and permanent allergies to mold and that persons with mold allergies are more likely to develop asthma, sinusitis, and bronchitis, which are triggered by allergens. The jury obviously accepted Dr. Johanning's testimony that Watson suffered these injuries as a proximate result of her exposure to microbial contaminants at Haverford Place. The Court notes that Dr. Johanning's objective medical findings as well as his scientific conclusions were not rebutted by Defendants.

The Court is unpersuaded by Defendants' contentions that the jury verdict and damage award to Stroot and Watson was speculative. In the Court's view, Defendants' decision to proceed to a jury decision was simply a matter of Defendants taking "a reasonable and calculated gamble" that the jury would discount the Plaintiffs' experts and rule in its favor.[6] The jury made a finding that Defendants violated the New Castle County Housing Code; that Defendants violated the Landlord–Tenant Code, § 5303(a)(1)-(5); and that Defendants were negligent under the common law. Having found Stroot and Watson contributorily negligent, the jury

nevertheless awarded $1,000,000 to Stroot, and $40,000 to Watson. Given the permanent nature of Plaintiffs' injuries as well as the physical and emotional pain and suffering Stroot and Watson will have to endure for the remainder of their lives, the Court does not find the $1,000,000 verdict to Stroot, or the $40,000 verdict to Watson unreasonable, nor is its conscience shocked.

### CONCLUSION

For the reasons stated herein, Defendants' motions to alter or amend judgment related to Elizabeth Stroot and Joletta Watson are DENIED.

**IT IS SO ORDERED.**

---

**6.** *Compare with Messick v. Star Enterprise,* Del.Super., C.A. No.: 93C–03–14, Carpenter, J. 1998 WL 110082 (Jan. 30, 1998) (Mem. Op.).