**NEW HAVERFORD PARTNERSHIP, a Delaware general partnership, Richard F. Deery, Edward L. Davidson, Jr., and Mid–Atlantic Realty Company, Inc., a Delaware Corporation, Defendants Below, Appellants,**

v.

**Elizabeth STROOT and Joletta Watson, Plaintiffs Below, Appellees.**

No. 549, 1999.

Supreme Court of Delaware.

Submitted: Jan. 30, 2001.
Decided: May 7, 2001.
Revised: May 8, 2001.
Reargument Denied: May 29, 2001.

James F. Kipp, Esquire (argued) and William Doerler, Esquire (argued) of Trzuskowski, Kipp, Kelleher & Pearce,

P.A., Wilmington, Delaware, for Appellants.

Robert J. Katzenstein, Esquire, Michele C. Gott, Esquire, Kathleen M. Miller, Esquire (argued), Joelle E. Polesky, Esquire, of Smith, Katzenstein & Furlow LLP, Wilmington, Delaware; Of Counsel: Guy Keith Vann, Esquire of New York, New York, for Appellees.

Before HOLLAND, BERGER and STEELE, Justices.

BERGER, Justice.

In this appeal we consider whether a landlord may be held liable for injuries suffered by its tenants because of the unsanitary condition of its apartments. Landlord[1] argues that it owes no common law duty to maintain the apartments and, under the Landlord Tenant Code[2], a tenant may not recover damages for personal injuries without establishing negligence *per se.* Landlord also raises numerous objections to the trial court's rulings on the admissibility of expert testimony and other evidentiary matters. Finally, Landlord argues that the jury verdict was excessive and that the trial court should have granted its motion for remittitur.

We hold that the Landlord Tenant Code imposes a duty on landlords to maintain the leased premises in a safe, sanitary condition and that an injured tenant may recover for personal injuries sustained as a result of landlord's negligent failure to do so. We also find no abuse of discretion in the trial court's contested evidentiary rulings or in its decision denying remittitur. Accordingly, we affirm.

Factual and Procedural Background

Elizabeth Stroot and Joletta Watson, were tenants at the Haverford Place apartments in the early 1990's. They had continuing problems with water leaks and mold in their apartments, and both women's general health deteriorated while living there. Stroot, whose health problems were more severe, was a 33 year old graduate student when she and a friend moved into a third floor apartment at Haverford Place in August 1992. Stroot immediately noticed mold around the windows and in the bathroom. Although she attempted to remove the mold by washing the affected areas with bleach, the mold kept returning. There also were leaks in Stroot's bedroom ceiling and in the kitchen sink and bathroom.

In September 1993, Stroot's roommate left and Stroot moved into a one bedroom apartment in another building at Haverford Place. The bathroom ceiling in this unit, also, leaked. Within a few months, the leaks had caused holes in the drywall and the edges of those holes were covered with a black substance. Whenever the tenants above Stroot showered, black water ran out of the holes.

Stroot complained to the management and was told that the problem was caused by the upstairs tenants taking "sloppy" showers. Although the landlord made some effort to fix the upstairs shower, nothing was done to Stroot's apartment and the bathroom ceiling kept getting worse. By May 6, 1994, Stroot made an emergency call to the maintenance department because the hole in the bathroom ceiling was so large that it was not just leaking, it was "raining." After a mainte-

---

1. Appellants are New Haverford Partnership, the landlord, the Partnership's two general partners, and Mid–Atlantic Realty, the apartment manager. They will be referred to collectively as Landlord.

2. 25 *Del. C.* Part III.

nance person inspected her bathroom, the apartment managers told Stroot that they would fix her bathroom as soon as they resolved the problems in the bathroom above hers.

On the evening of May 16, 1994, Stroot's bathroom ceiling collapsed and water from the ceiling flooded her bathroom floor. The drywall debris and the exposed ceiling area were covered with black, green, orange and white mold. According to Stroot, the room was filled with a strong, nauseating odor. When she called maintenance, she was told that they could not do anything until the next morning. Stroot closed the bathroom door and slept in her apartment that night. By the next morning, she could not breathe. Stroot called her doctor, who told her to get an ambulance and go the hospital. When she was released later that day, Stroot decided that she could not continue to live at Haverford Place.

Stroot has suffered from allergies and asthma since childhood. As a result, she has required hospitalization and strong medications, such as prednisone, periodically. But the frequency and severity of her medical problems increased significantly after she moved to Haverford Place. During the 21 months that she lived at Haverford Place, Stroot was forced to go to the emergency room seven times for asthma attacks. In addition, she spent a total of nine days as an inpatient and received intravenous steroids twelve times.

Watson lived in Haverford Place from 1990 to 1994 and experienced many of the same problems as Stroot. The pipe under her kitchen sink burst and hot water flooded the room. The maintenance person fixed the pipe, but the water damaged cabinets were never replaced. There also were water problems in the bathroom. There was a gap between the tiles and the tub; the drywall behind the tiles was rot-

ten; there were black mold spots behind the toilet, around the sink and on the ceiling; and the windows were coated with a gummy substance. Watson scrubbed the apartment in an effort to remove the mold, but it kept returning.

During the first two years of her tenancy, Watson traveled frequently and did not spend much time in the apartment. In 1993, however, when she was at home more often, Watson started to experience health problems. She was tired, suffered frequent headaches, sinus problems, chest pains and body aches. Watson obtained medicine from her doctor, but she did not begin to feel better until about six months after she left Haverford Place.

Plaintiffs offered the opinions of several experts to support their claims. Dr. Yang, a mycologist and microbiologist, inspected Haverford Place, took bulk samples and air samples, and interviewed residents. He opined that there was excessive and atypical mold growth in the apartment buildings; that it was caused by long term leaks; and that the widespread mold contamination posed a health risk to tenants. Dr. Johanning, a physician board-certified in environmental and occupational medicine, gathered similar data at Haverford Place. He also took blood samples from plaintiffs. Based on his analysis of this data, Johanning opined that the high concentration of toxic mold at Haverford Place significantly and permanently increased the severity of Stroot's asthma. He also opined that Stroot's cognitive deficits, diagnosed by Dr. Gordon, were caused by exposure to excessive and atypical molds. Johanning testified that Watson developed an allergy to Penicillium and permanent upper respiratory problems as a result of her exposure to the same molds.

Dr. Gordon, a neuropsychologist who has studied cognitive defects associated

with exposure to atypical molds, evaluated Stroot and concluded that she suffers from significant cognitive impairment in the areas of attention, concentration, memory and executive functions. Gordon opined that these problems are permanent and were proximately caused by Stroot's exposure to atypical molds. Dr. Rose, a physician who is board-certified in pulmonary, occupational and environmental medicine, examined Stroot and opined that Stroot developed osteopenia as a result of her increased steroid usage while at Haverford Place. Dr. Rose also opined that Stroot's steroid usage increased her risk of developing tuberculosis.

Michael Lynn, an architect and partner in a real estate due diligence firm, performed a limited property condition assessment at Haverford Place. He noted standing water, roof joists covered with fungus, water-damaged dry wall covered with mold, and other evidence of excessive moisture. He opined that the deferred maintenance on the buildings was excessive and that landlord's failure to maintain the buildings was the proximate cause of the unhealthy and unsanitary conditions he observed.

After a two week trial, the jury found in favor of plaintiffs. The jury awarded Stroot $1,000,000 for personal injuries and $5,000 for property damage, but the award was reduced by 22%, which was determined to be Stroot's level of contributory negligence. Watson was awarded $40,000 for personal injuries, reduced by the same 22%. Landlord filed a motion for remittitur, which was denied. This appeal followed.

## Discussion

Landlord's numerous claims of error fall into three categories. First, Landlord argues that its conduct does not give rise to any of the three causes of action that plaintiffs were allowed to present to the jury. Second, it contends that the trial court erred in certain evidentiary rulings—primarily relating to the admissibility of expert testimony. Finally, Landlord complains that the jury verdict was so excessive as to shock the conscience and should have been reduced on its motion for remittitur. Each will be considered in turn.

### 1) Tort liability of Landlord

Plaintiffs pursued three theories of tort liability: (i) ordinary or common law negligence based on Landlord's alleged failure to maintain safe and sanitary conditions in the apartments; (ii) negligence *per se* based on alleged violations of the New Castle County Code [3]; and (iii) negligence *per se* based on alleged violations of the Landlord Tenant Code. The jury verdict form required a separate finding for each of the asserted forms of negligence, and the jury found for the plaintiffs on all three. Landlord argues that it has no duty that would support a claim for common law negligence and that the statutes at issue do not give rise to a claim of negligence *per se*.

Landlord bases its common law negligence argument on the fact that, before the Landlord Tenant Code was enacted in 1972, landlords had no duty to maintain their buildings in a safe and sanitary condition. Although the Landlord Tenant Code imposes such a duty,[4] Landlord says that the statute cannot be used to support a claim of common law negligence. Plaintiffs' only recourse, according to Landlord, is the Landlord Tenant Code, which pur-

---

**3.** New Castle County Code Sections 10–35.1, 10–39.

**4.** 25 *Del. C.* § 5305(a)(2).

portedly abolishes all tort liability unless a plaintiff can establish negligence *per se.*

■ Landlord offers no authority for this position, which seems to be based on a misconception as to the meaning of the phrase "common law negligence." To state a claim for negligence one must allege that defendant owed plaintiff a duty of care; defendant breached that duty; and defendant's breach was the proximate cause of plaintiff's injury.[5] The duty owed may be one recognized at common law or one imposed by statute. In either case, the elements of the negligence claim are the same. The phrase "common law" negligence is sometimes used, as it was in this case, to differentiate between ordinary negligence and negligence *per se.*[6] It does not prevent a plaintiff from relying on a statute as the source of defendant's duty.

■ Landlord also is mistaken in its argument that the Landlord Tenant Code precludes claims for ordinary negligence. The Code does provide that it "shall regulate and determine all legal rights, remedies, and obligations of the parties and beneficiaries of any rental agreement...."[7] But there is nothing to suggest that, in undertaking to regulate landlord/tenant relations, the General Assembly also intended to eliminate a tenant's ability to bring tort claims against a landlord. Our courts have long recognized that such claims remain unaffected by the Landlord Tenant Code.[8]

■ In sum, we find no error in the trial court's decision allowing plaintiffs to pursue an ordinary, or common law, negli-

gence claim. Moreover, since the jury found in favor of plaintiffs on this claim, we need not address Landlord's arguments with respect to negligence *per se.* Assuming, without deciding, that it was error to allow the jury to consider the two negligence *per se* claims, they were duplicative of the ordinary negligence claim and the error, if any, was harmless.

### 2) Evidentiary Rulings

Landlord argues that the opinions of plaintiffs' experts were deficient in several respects: i) Lynn is not a property manager and is not familiar with the standard of care in Delaware; ii) Gordon did not scientifically eliminate other possible causes of Stroot's cognitive deficits; iii) neither Lynn, Yang, or Johanning took air pressure readings or otherwise determined the air flow within the apartment; iv) none of the experts had a scientific basis on which to conclude that the excessive mold found in 1994 also was present in 1992; and v) none of the experts had a proper foundation on which to base an opinion on causation. In addition, Landlord complains that evidence of mold in two apartments not inhabited by plaintiffs was prejudicial and not scientifically connected to the mold levels in plaintiffs' apartments. Finally, landlord contends that the trial court abused its discretion in refusing to order the production of Stroot's psychiatric records.

■ Rulings on the admissibility of evidence are reviewed for abuse of discretion.[9] With respect to Lynn's qualifications, we note that he is an architect who

5. *Russell v. K–Mart,* Del.Supr., 761 A.2d 1 (2000).

6. 57A *Am.Jur.*2d § 736.

7. 25 *Del.C.* § 5101(a).

8. See: *Jardel v. Hughes,* Del.Supr., 523 A.2d 518 (1987); *Koutoufaris v. Dick,* Del.Supr., 604 A.2d 390 (1992); *Hand v. Davis,* Del. Super, No. 87C–0C–6, 1990 WL 96583 (June 8, 1990).

9. *M.G. Bancorporation, Inc. v. Le Beau,* Del. Supr., 737 A.2d 513 (1999).

is licensed and has practiced in Delaware. He has worked with building owners and property managers in Delaware and around the country. Lynn testified that there is a national standard of care for buildings as far as maintenance, safety, and cleanliness. Given this background, we find no abuse of discretion in the trial court's decision to admit Lynn's opinion about the unsanitary conditions at Haverford Place and Landlord's failure to adequately maintain the apartments.

■ Landlord objects to Gordon's testimony on the ground that Gordon failed to eliminate possible causes of Stroot's cognitive deficit other than the excessive mold in her apartments. Specifically, it argues that Gordon should have reviewed Stroot's medical records to determine whether anything in her history would explain her cognitive deficits. Gordon took a history from Stroot and relied on Johanning's review of her medical records. Since his approach is accepted in the scientific community, we conclude that his opinion evidence was properly admitted.

■ Landlord argues that the opinions of Yang, Lynn and Johanning should have been excluded because they never studied the air flow or air pressure in the apartment buildings. Without scientific data showing how the air circulated between apartments, Landlord contends that the experts' conclusions lacked reliability. In deciding whether to admit expert testimony, the trial court may consider whether the scientific theory has been tested and subjected to peer review; whether it is governed by standards; and whether it is generally accepted in the relevant scientific community.[10] These measures of reliability are not definitive, however, and the

trial court has flexibility in deciding whether the so-called Daubert factors are appropriate in a given case.[11] The voir dire established that the methodology employed by plaintiffs' experts (without the use of air pressure data) was reviewed by peers and generally accepted in the scientific community. Accordingly, we find that the trial court properly exercised its gatekeeping function in admitting the experts' testimony.

■ Plaintiffs' experts conducted all of their investigations and obtained all of their physical evidence in 1994. They had not visited Haverford Place or examined either plaintiff before that time. Nonetheless, the experts opined that the excessive mold found in 1994 also was present in 1992 and contributed to plaintiffs' injuries. Landlord argues that, since there was no testing in 1992, plaintiffs' experts had no reliable basis on which to opine about 1992 conditions. This argument ignores the fact that plaintiffs were able to provide factual information about the conditions in 1992; that Stroot's increased health problems began in 1992; and that the water damage and mold levels observed in 1994 were the result of long term water problems in the buildings. While the experts' opinions about 1992 conditions may not have been as well supported as their opinions about 1994 conditions, they were still within the realm of scientific reliability and the trial court acted within its discretion in allowing them.

■ Landlord also objects to the admission of expert testimony on causation. It argues that the experts failed to establish a proper baseline from which to compare the mold levels at Haverford Place and they failed to eliminate other possible

10. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 580, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

11. *M.G. Bancorporation, Inc. v. Le Beau,* 737 A.2d at 522.

causes of plaintiffs' medical complaints. With respect to the baseline information, Landlord argues that the experts should have undertaken extensive testing of the air outdoors, in other buildings, and other apartment units in order to determine scientifically the "normal" mold level. Without that information, any opinion as to "excessive" mold levels is unreliable. Landlord also argues that the causation opinions were flawed because the experts did not exclude other possible causes of plaintiffs' injuries. Stroot, for example, is a smoker and had a dog even though she is allergic to dogs. Yet the experts did not scientifically eliminate these possible causes of Stroot's medical problems.

These arguments are unpersuasive. Although no "extensive" baseline testing was undertaken, Yang did test an outdoor air sample and found that the mold level in Haverford Place was more than ten times higher. In addition, Johanning testified that the mold level inside the building was so high that it overloaded the machine used to test samples. Given these facts, we conclude that the failure to conduct extensive baseline testing goes to the weight of the experts' opinions, not their admissibility. The same is true for the asserted failure to eliminate other possible causes of plaintiffs' health problems. Johanning testified that he followed the scientifically accepted procedure of obtaining a medical history and a detailed questionnaire from the plaintiffs. He then ruled out other possible causes of plaintiffs' health problems by reviewing that information together with the blood test results and the data collected from the apartment buildings. The foundation for an expert's causation opinion need not be established with the precision of a laboratory experiment. The facts here support the trial court's decision to admit the causation opinions.

Landlord's other evidentiary complaints also lack merit. For example, Landlord argues that evidence of mold in two apartments not inhabited by plaintiffs should have been excluded. Yang testified, however, that fungi migrate and that the air between apartments is always being exchanged. The high level of contamination in the two apartments at issue also confirms the pervasive nature of the mold problem. As a result, the mold levels in the two apartments not occupied by plaintiffs were relevant. The trial court determined that the probative value of those test results outweighed their prejudicial effect and we find no basis on which to overturn that decision.

Landlord's last evidentiary argument is that the trial court should have ordered the production of Stroot's psychiatric records so that its expert could evaluate possible causes of Stroot's cognitive deficit. When Landlord requested these records, it was unable to provide more than a general statement why they might be useful. The trial court denied the request without prejudice, and suggested that Landlord could renew its motion after developing more specific reasons to support its request. Landlord never did. We find no abuse of discretion. If the records were essential to Landlord, it should have been able to articulate more than the general explanation it provided to the court.

### 3) Motion for Remittitur

Landlord argues that the amounts awarded to Watson and Stroot were so excessive that they shock the conscience. It points out that Watson's medical complaints were relatively mild and she had no observable symptoms after leaving Haverford Place. Stroot incurred $28,810 in medical expenses and suffered aggravation of her asthma and allergies. Her cognitive deficit, according to Landlord is

mild and her increased risks of osteopenia and tuberculosis were not quantified. At best, according to Landlord, these injuries could support an award of $250,000, not the $1,000,000 set by the jury.

The trial court carefully considered these arguments:

> The presumption in Delaware is that a jury verdict is "correct and just." A Motion for Remittitur ... may be granted ... only with great reluctance. This Court has the authority to grant a new trial if it finds that the verdict is based upon "passion, partiality, prejudice, mistake or misapprehension on the part of the jury." It has also been held that a verdict will not be set aside unless it is "so grossly excessive as to shock the Court's conscience and sense of justice; and unless the injustice of allowing the verdict is clear."

> \*     \*     \*     \*     \*     \*

> The jury obviously accepted Dr. Johanning's and Dr. Rose's medical testimony in this case that despite other triggers which could cause her to have an asthma attack, Stroot's asthma was nevertheless significantly exacerbated or worsened by her exposure to microbial contamination at the apartment complex, and that her need for medication increased significantly after she moved to Haverford Place. The Court is satisfied that Stroot showed to a reasonable degree of medical probability that her asthma symptoms decreased, but did not return to her pre-exposure baseline, after she left the apartment complex.

> \*     \*     \*     \*     \*     \*

> The Court also finds that the medical and scientific evidence presented at trial established ... that [Stroot's] osteope-

nia is causally related to her increased steroid use not only while living at Haverford Place, but also after she moved out. The evidence ... also showed that Stroot's increased need for steroids to suppress the asthma has increased her risk for developing active tuberculosis.

> Further, the jury may have also chosen to accept Dr. Wayne Gordon's testimony ... that ... Stroot's cognitive deficits in three areas—attention, concentration, and executive functioning, were proximately caused by her long-term exposure to microbial contamination at Haverford Place.

> Turning to ... Joletta Watson ... Dr. Johanning ... stated that ... Watson had a positive IgE, indicating the development of a permanent mold allergy. Dr. Johanning opined ... that Watson developed significant and permanent allergies to mold and that persons with mold allergies are more likely to develop asthma, sinusitis, and bronchitis....

> \*     \*     \*     \*     \*     \*

> Given the permanent nature of Plaintiffs' injuries as well as the physical and emotional pain and suffering Stroot and Watson will have to endure for the remainder of their lives, the Court does not find the $1,000,000 verdict to Stroot, or the $40,000 verdict to Watson unreasonable, nor is its conscience shocked.[12]

We accept the trial court's well reasoned analysis.

### Conclusion

Based on the foregoing, the decision of the Superior Court is affirmed.

---

**12.** *Stroot v. New Haverford Partnership et al,* Del.Super., 1999 WL 753916. (Citations omitted.)