# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

JASON PATTON, )
    Plaintiff, )
         v. )    C.A. No. N12C-01-177 CLS
24/7 CABLE COMPANY, LLC, )
    Defendant/Third-Party Plaintiff, )
DANELLA LINE SERVICES )
COMPANY, INC., )
    Defendant/Third-Party )
    Defendant/Fourth-Party Plaintiff, )
MELCAR, LTD., INC., MALEC )
CONSTRUCTION COMPANY, LLC, )
a Pennsylvania LLC, and SUSSEX )
PROTECTION SERVICE, LLC, )
    Defendants/Fourth-Party )
    Defendants, )
24/7 MID-ATLANTIC NETWORK, )
LLC, 24/7 FIBER NETWORK, )
LEVEL 3 COMMUNICATIONS, )
INC., and FIBERTECH NETWORKS, )
LLC, )
    Defendants, )
         v. )
DOUGLAS C. RILEY, )
    Third-Party Defendant. )

## ORDER

On this 31st day of August, 2016, and upon Defendant Sussex Protection Service, LLC's ("Sussex") Motion for Summary Judgment, it appears to the Court that:

1. This is a negligence action brought by Plaintiff Jason Patton ("Plaintiff") against nine defendants, including Sussex, seeking recovery for injuries he sustained on June 10, 2011, resulting from a motor vehicle collision between Plaintiff and Third Party Defendant Douglas Riley ("Riley") in the vicinity of a construction site on Route 13 in New Castle, Delaware. Plaintiff alleges that the collision was caused, *inter alia*, by Sussex's failure to protect against and/or warn of the dangerous condition created by the construction activities in the median of Route 13, including the failure to close the crossover, or median break, connecting the northbound and southbound lanes of Route 13 and failure to use a flagger, and that Sussex is liable for his injuries, because it had control of the roadway in the area in which the collision occurred and was responsible for the work it subcontracted to perform, for taking all reasonable safety precautions at the worksite to protect the public, and for complying with the construction permit issued by the Delaware Department of Transportation ("DelDot").

2. The Parties have stipulated to the following facts:[1] At all times relevant, Defendant Danella Line Services Company, Inc. ("Danella") was hired as the general contractor to provide Fibertech Networks, LLC

---

[1] *See* Stipulation of Facts (Trans. ID 58234718).

2

("Fibertech") with a conduit for fiber optic cable along a distance of Route 13 to connect to a splice box under the median of Route 13. Fibertech obtained Permit No. NC-072-MIS (the "Permit") in furtherance of this project. Danella subcontracted portions of the work to three subcontractors, who are also defendants: Melcar, Ltd., Inc. (directional drilling), Sussex, and Malec Construction Company, LLC (backhoe work). At approximately 9:15 pm on the evening of June 10, 2011, as work was being performed by Danella and several other contractors pursuant to the Permit, Riley drove his Dodge Durango with his wife and two sons on the median break, which had not been closed, from northbound Route 13 in an attempt to cross over the southbound lanes to reach a parking lot on the other side, and stopped at the stop sign before driving across. Plaintiff was driving his motorcycle on southbound Route 13 when the collision between him and Riley occurred. As a result of this collision, Plaintiff suffered injuries.

3. On August 31, 2015, Sussex moved for summary judgment on Plaintiff's claims, arguing that there is no genuine issue of material fact that could prevent summary judgment on its behalf, because there is no evidence that Sussex negligently performed its contractual duties described in its subcontract with Danella or that it had any control over the area or traffic control setup that Plaintiff alleges caused the accident. Specifically, Sussex

3

asserts that it merely contracted to provide the equipment and the set up, which it did, that Danella instructed it as to when the work would be performed and which DelDot "case" it needed to bring equipment for and utilize in its set up, that it did not have authority or control to close lanes of traffic or employ flaggers, and that it had no control over the backhoe allegedly in the median or the work being performed there. Further, as a matter of law in Delaware, when a contractor follows a DelDot approved plan, it is not negligent merely because there may have been another way to control traffic.

4.      Sussex also argues that Plaintiff's claim that it violated § 107.1 of DelDot's Standard Specifications must be dismissed, because, as a nonparty to or unintended third-party beneficiary of any contract made with DelDot allegedly incorporating that provision, Plaintiff lacks standing to enforce the terms of any DelDot contract. Alternatively, Sussex argues that this contract claim must be dismissed for failure to state a claim for which relief can be granted, because Sussex never entered into any contract with DelDot and Plaintiff was not a party to the contract or Permit between DelDot and Fibertech.

5.      In opposition to Sussex's Motion, Plaintiff argues that Sussex was responsible for safe traffic control during the construction project, which it

failed to do, and that such failures proximately caused Plaintiff's injuries. Specifically, Plaintiff alleges that Sussex had duties under the Permit to request permission to work on a Friday night, to close the crossover, to provide a flagger, and to implement additional traffic controls, and that it was responsible under its subcontract with Danella to take all reasonable safety precautions and to comply with all legal requirements pertaining to its work in order to ensure the safety of persons and property. Further, Plaintiff alleges that Sussex's subcontract with Danella incorporates Danella's Master Agreement with Fibertech.

6. On July 12, 2016, at the request of the Court, the Parties submitted supplemental memoranda to assist the Court in determining, *inter alia*, the issue of duty. Sussex argues that it had no duties beyond those established by its subcontract with Danella, which duties it fulfilled by setting up the temporary traffic controls specified by Case 3 as directed by Danella. On the other hand, Plaintiff argues that Sussex assumed greater responsibilities than simply setting up the traffic controls in its subcontract with Danella, including the duty to take all reasonable safety precautions with respect to its work and to comply with all safety requirements.

7. The Court may grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with

5

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."[2] The moving party bears the initial burden of showing that no material issues of fact are present.[3] Once such a showing is made, the burden shifts to the non-moving party to demonstrate that there are material issues of fact in dispute.[4] In considering a motion for summary judgment, the Court must view the record in a light most favorable to the non-moving party.[5] The Court will not grant summary judgment if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of the law.[6] Where the defendant's legal obligation arises by way of contract, summary judgment is improper "where reasonable minds could differ as to the contract's meaning, a factual dispute results and the fact-finder must consider extrinsic evidence."[7]

8. It is well-established that in order to maintain an action sounding in negligence that a plaintiff must demonstrate that (i) the defendant owed the plaintiff a duty of care; (ii) that the defendant breached that duty; and (iii)

---

[2] Super. Ct. Civ. R. 56(c); *Burkhart v. Davies*, 602 A.2d 56, 59 (Del. 1991).
[3] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).
[4] *Id.* at 681.
[5] *Burkhart*, 602 A.2d at 59.
[6] *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962); *Phillip-Postle v. BJ Prods., Inc.*, 2006 WL 1720073, at *1 (Del. Super. Apr. 26, 2006).
[7] *Spence v. Layaou Landscaping, Inc.*, 2013 WL 6114873, at *5 (Del. Super. Oct. 31, 2013) (quoting *GMG Capital Invest., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012)).

that the defendant's breach was the proximate cause of the plaintiff's injury.[8] If the plaintiff fails to makes out a prima facie case of negligence, the defendant is entitled to judgment as a matter of law.[9] A defendant owes the plaintiff a duty of care where the defendant was under a legal obligation to protect the plaintiff from the risk of harm which caused the plaintiff's injuries.[10] "[W]hether a duty exists is entirely a question of law, to be determined by reference to the body of statutes, rules, principles and precedents which make up the law; and it must be determined by the court."[11]

9.      In the case *sub judice*, Plaintiff alleges that Sussex, a subcontractor hired by the general contractor pursuant to a subcontract, was negligent. Delaware courts have consistently held that, generally, "it is the scope of the undertaking, as defined in the contract, which gives shape to the independent contractor's duty in tort."[12] Apart from the contract, where a subcontractor exercises actual control over a job site, the law will impose a duty on it to act as a reasonable contractor in providing services necessary for the protection of the traveling public within the construction zone.

---

[8] *Pipher v. Parsell*, 930 A.2d 890, 892 (Del. 2007) (citing *New Haverford P'ship v. Stroot*, 772 A.2d 792, 798 (Del. 2001)).

[9] *Id.*

[10] *Id.*; *Thurmon v. Kaplin*, 1999 WL 1611327, at *2 (Del. Super. Mar. 25, 1999).

[11] *Pipher*, 930 A.2d at 892 (citations omitted).

[12] *Spence*, 2013 WL 6114873, at *3 (citing *Brown v. F.W. Baird, LLC*, 2008 WL 324661, at *3 (Del. 2008)).

7

10. Because the evidence provided by the Parties undisputedly demonstrates that Sussex did not exercise actual control over the job site, despite Plaintiff's conclusory assumption otherwise, and, instead, took direction from Danella as to when and where to set up particular temporary traffic controls, the scope of Sussex's duties is defined solely by its subcontract with Danella.

11. "Under Delaware law, the interpretation of a contract is a question of law only if the terms of the agreement are plain and unambiguous."[13] Where the contract's terms are clear and unambiguous, such that a reasonable person in the position of either party would have no expectations inconsistent with the contract language, the Court will interpret them according to their ordinary meaning.[14] An ambiguity exists not because the parties disagree as to the proper construction of a term but when the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings.[15] Further, "[w]hen interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement" by construing the agreement as a whole,

---

[13] *Jordan v. E.I. Du Pont de Nemours & Co.*, 1991 WL 18108, at *1 (Del. Super. Feb. 8, 1991) (citing *Klair v. Reese*, 531 A.2d 219 (1987) (relying on Restatement (Second) of Contracts, § 212 (1981)).

[14] *GMG*, 36 A.3d at 780.

[15] *Id.* (citations omitted).

8

giving effect to all provisions therein.[16]  Thus, it is axiomatic that "[t]he meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan."[17]

12.    The "duty" provisions at issue in Sussex's Subcontract with Danella state, in pertinent part, as follows:

> "1.1(2)    The Subcontract Document consists of . . . (2) The contract, subcontract, or other agreement between **State of Delaware – Department of Transportation** (the "Customer") and [Danella] (the "Prime Contract"), including any and all Contract Documents enumerated therein, including any and all General, Special, Supplementary and other Conditions thereto of thereof, and any and all Exhibits thereto, and any and all Drawings, Specifications, and Addenda issued prior to the execution of the Prime Contract."[18]

> "3.1    [Sussex] shall execute the work, perform the labor, supervision and other services, and provide the equipment, tools, and materials, as required by the terms of this Subcontract, including the Subcontract Documents, as generally described on **Exhibit A** . . . and that which is reasonably inferable therefrom, in order to achieve the results intended

---

[16] *Id.* (citing *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985)).

[17] *Id.*

[18] Sussex's Mot. Summ. J., Exh. H, Subcontract Between Sussex and Danella ("Subcontract"), at § 1.1(2) (Trans. ID 57794116) (emphasis in original).  The Court notes that Plaintiff cites to this section to support his assertion that Danella's Master Agreement with Fibertech and all permits and specifications were incorporated specifically into Sussex's subcontract.  However, Plaintiff fails to explain why the Court should read Danella's Master Agreement with Fibertech into this subcontract in place of Danella's contract with DelDot.  Even so, regardless of this technicality, Plaintiff fails to demonstrate how the Court should find that the Permit was specifically incorporated into Sussex's subcontract with Danella in order to find that Sussex was responsible for notifying DelDot that construction was taking place on the night in question.

thereby (collectively, the "Work"), in connection with the project described on **Exhibit A** (the "Project").[19]

"Exhibit A: I. [Sussex] shall perform the following Work: Supply and set up per state specifications Traffic Control when requested by Danella."[20]

"3.2 [Sussex] agrees to perform the Work under the direction of [Danella] . . . and to perform the Work in strict conformity with the requirements of the Subcontract Documents."[21]

"14.4(c) [Sussex] shall comply with all laws, codes, ordinances, rules, regulations, orders, and directives ("Legal Requirements") of any federal, state, or local governmental body, board, authority, department, agency, or court . . . pertaining to (i) the Work, including providing any notices required by any Legal Requirements and securing and paying for all permits, licenses and inspections necessary for the performance of the Work, and (ii) the employees and other personnel employed or engaged by [Sussex]."[22]

"14.7 [Sussex] shall take all reasonable safety precautions with respect to the Work, and shall comply with all Legal Requirements pertaining to, or the safety of persons or property, and comply with any safety rules, measures, or policies initiated by [Danella] or Customer (collectively, "Safety Requirements"). [Sussex] shall assume full responsibility for compliance with all Safety Requirements, and shall bear all costs and damages attributable to any failure to so comply, and shall indemnify and hold harmless [Danella] . . . for all costs, losses, and expenses incurred by any of them . . . . [Sussex] shall report immediately to [Danella] any injury to any of [Sussex's] employees or damage to any property on or about the Project Site."[23]

---

[19] *Id.* at § 3.1.
[20] *Id.* at Exh. A ¶ I.
[21] *Id.* at § 3.2.
[22] *Id.* at § 14.4(c).
[23] *Id.* at § 14.7.

13.   Plaintiff's assertion that, by virtue of its subcontract, Sussex undertook responsibility for the safety of the traffic controls utilized throughout the construction project, as well as for warning the public of the dangers presented by the construction taking place in the median, is belied by the plain language of the subcontract itself.  First, § 3.1 clearly states that the scope of Sussex's work, labor, supervision, and other services is described on Exhibit A and that which is reasonable inferable therefrom.  Second, Exhibit A references only the scope of work required of Sussex and clearly states that such work is to supply and set up per state specifications traffic control when requested by Danella.  Exhibit A makes no mention of any discretionary power left to or required of Sussex, and § 3.2 confirms this omission by clearly stating that Sussex agrees to perform the work under the direction of Danella and to perform the work in strict conformity with the requirements of the subcontract documents.  Therefore, Sussex's subcontract clearly defines the work to be performed by Sussex as merely setting up traffic controls in accordance with state specifications and at the direction of Danella.

14.   Plaintiff's reference to Sussex's contractual responsibility to take all reasonable safety precautions and to comply with all legal requirements pertaining to the work does not include the duty to act as a reasonable

11

contractor in providing services necessary for the protection of the traveling public within the construction zone. As discussed *supra*, the subcontract clearly defined the work as the setting up of traffic controls; thus, § 14.7 merely requires Sussex to take all reasonable safety precautions with respect to its setting up of the specific traffic controls. Plaintiff does not allege that his injury was caused during Sussex's set up; rather, Plaintiff alleges that the selected traffic controls were inadequate, because they failed to close the crossover and utilize a flagger, which failures caused the collision. However, the subcontract did not grant Sussex any duty or commensurate power in selecting which state specifications to employ and whether to supplement the specified traffic controls with additional, non-mandatory, devices based on its independent judgment, despite having no control over any of the construction activities occurring at the site.[24]

15.     The Parties have directed the Court to consider its holding in *Thurmon v. Kaplin*, as it involved a motor vehicle collision that occurred in a

---

[24] Even if the scope of work Sussex was contractually obligated to perform included the discretion to select which state specification to employ, this Court has held, as was recently affirmed by the Delaware Supreme Court, that "if a contractor is controlling traffic at a construction site pursuant to a DelDot-approved traffic control plan prepared in accordance with the [MUTCD], then [the contractor] cannot be held liable for an action in negligence provided that it was actually following the approved plan" simply because there might have been another way to control the traffic. *Hales v. English*, 2014 WL 12059005, at *2 (Del. Super. Aug. 6, 2014), *aff'd sub nom. Hales v. Pennsy Supply, Inc.*, 115 A.3d 1215 (Del. 2015) (TABLE) (citing High v. State Highway Dep't, 307 A.2d 799 (Del. 1979)).

construction zone.[25] The plaintiff alleged negligence by the contractor, who had been hired by DelDOT to mill and repave the road, and by the subcontractor, who had been hired by the contractor to apply temporary striping to the road, for failure to provide temporary striping and arrows and failure to close the turn lane.[26] According to the record, the subcontractor had no decision-making authority as to the striping, performed only pursuant to instructions from DelDOT and/or the contractor, and its work was closely inspected every day, requiring specific approval before it could leave the jobsite.[27] The Court found that, in the absence of any evidence suggesting that the subcontractor exercised actual control over or otherwise assumed responsibility for the area in question, there was no basis to impose a duty on the subcontractor and, thus, the contractor had assumed the responsibility of protecting the traveling public within the construction zone.[28]

16.     *Thurmon* is analogous to the extent Sussex performed only when directed by Danella, undertook to set up traffic control pursuant to state specifications, and had no decision-making authority beyond these responsibilities. However, because the MUTCD cases at issue require more decision-making than merely painting lines and arrows on a road according

---

[25] 1999 WL 1611327, at *1.
[26] *Id.*
[27] *Id.*
[28] *Id.* at *3.

to the explicit instruction and under the strict supervision of others, summary judgment depends on whether Sussex complied fully with the state specifications to which Danella directed it to set up traffic controls. However, to be clear, as Sussex assumed no responsibility with regard to which MUTCD case to employ, Sussex's liability is limited to whether or not it fully complied with the set up required by the Case it was directed to use by Danella.

17.    Sussex's assertion that it complied with this duty when it set up the traffic control plan selected by Fibertech and approved by DelDOT—Case 3 from Part 6 of the MUTCD—is confirmed by DelDot testimony but is disputed by Plaintiff's expert report.  Additionally, while much argument has been exchanged as to what constitutes an "intersection" in relation to Note 13 of Case 3 and Note 14 of Case 7, both of which state, "[w]hen any road intersects the roadway on which work is being performed, additional traffic controls shall be erected as directed by the Chief Traffic Engineer or designee," neither Note even references an "intersection" and neither party has addressed the limiting language.  Therefore, when viewing the record in a light most favorable to Plaintiff, there are factual disputes as to whether Sussex fully complied with its traffic set up as directed by Danella.  Thus, Defendant's Motion is **DENIED** as to Plaintiff's general negligence claims.

18. However, because it is undisputed that the underlying construction project was not a DelDot construction project, that DelDot was not a party to any of the construction contracts, and that the Permit does not specifically incorporate or invoke DelDot's Standard Specifications, Plaintiff's claims premised solely on Defendant's alleged violation of § 107.10 fail to state a claim upon which relief can be granted.[29] Therefore, Defendant's Motion is **GRANTED** as to Plaintiff's allegations that Defendant was negligent when it violated § 107.10 of DelDot Standard Specifications, and, accordingly, Count VII of the complaint is **DISMISSED**.

19. For the foregoing reasons, Sussex's Motion for Summary Judgment is **GRANTED, IN PART, AND DENIED, IN PART**.

**IT IS SO ORDERED.**

/s/Calvin L. Scott
The Honorable Calvin L. Scott, Jr.

cc: Prothonotary

---

[29] *See Thurmon*, 1999 WL 1611327 (DelDot highway construction project); DelDot Standard Specifications §101.17 (Aug. 2001) (defining "contract" as "[t]he written Agreement between the Department and the Contractor setting forth the obligation of the parties for the performance of the work"); *id.* at § 101.21 (defining "Contractor" as "[t]he individual or legal entity contracting with the Department for performance of the work"); *id.* at § 101.25 (defining "Department" as "Delaware Department of Transportation").