Judge DENNIS R. BAGNERIS, SR.

STATEMENT OF THE CASE

In this mesothelioma-personal injury action, plaintiff-relator Christine Songy seeks supervisory review of the denial of her motion for partial summary judgment. Plaintiff Christine Songy and approximately 679 others filed this class action on October 25, 2001, seeking damages for exposure to mold and asbestos in the Plaza Towers office building.
Plaintiff Songy filed a motion for summary judgment on a number of issues. The matter came for hearing on March 28, 2003, and a written judgment denying plaintiffs motion was signed on April 4, 2003.

FACTS

Plaintiff sought summary judgment finding that: (1) she has malignant mesothelio-ma; (2) exposure to asbestos was “a” cause of her mesothelioma; (3) she was exposed to asbestos in the Plaza Tower office building; (4) she was exposed to mold in the Plaza Tower office building; (5) her exposure to mold, mold spores and the by-products of mold spores at the Plaza Tower was a “promoter and a substantial contributing factor to her injuries;” (6) she did not have malignant mesothelioma in 1997; and (7) she had no other direct occupational exposure to asbestos except the Plaza Towers.
A number of exhibits are attached to plaintiffs writ application, and were submitted to and considered by the trial court.
Exhibit 1 is a May 20, 2002 Meadow-crest Hospital tissue report from Dr. Don Hemelt, a pathologist, concluding that plaintiffs pleural biopsy showed “probable” malignant mesothelioma. Dr. Hemelt confirmed Dr. Ronald Welsh’s ^diagnosis of “probable” malignant mesothelioma, which diagnosis is reflected in a May 20, 2002 letter from Dr. Welsh to Dr. Hemelt. Dr. Welsh, also a pathologist, stated that the results he saw “do not make a positive diagnosis of mesothelioma, but do make it the most likely one at this time.” He noted that additional proof would come by electron microscopy, and further noted that “[i]f there is the possibility of litigation it would be well to inform the patient and family of the need for autopsy verification of the diagnosis to exclude other primary malignant neoplasms.” Dr. Welsh thanked Dr. Hemelt for the opportunity to “study this most interesting case.”
Exhibit 2 is an office note from Dr. N. Chandrasekaran, an oncologist, referenc *727 ing a June 10, 2002 office visit by plaintiff. The note is copied to Drs. Lillibeth Ro-chon, Mark Kappelman and William Bor-rón. The note refers to plaintiff being aware of the diagnosis of mesothelioma, an incurable disease, and mentions possible chemo-treatment options, and the possibility of enrolling in a treatment trial at LSU.
Exhibit 3 is a July 3, 2002 letter from Dr. William Borron to Dr. Lillibeth Ro-chon, noting that he had seen plaintiff previously in Meadowcrest Hospital for “recurrent pleural effusion.” He reported that the results of her pleural biopsy were “consistent with malignant mesothelioma.”
Exhibit 4 consists of excerpts from a January 13, 2003 deposition of Dr. Tim Oury, a pathologist, who said that the stain test in plaintiffs case was “not definitive for mesothelioma, but is most consistent with mesothelioma.” He said “[w]ith what I have right now, my opinion is it is more probable than not that this is mesothelio-ma.” He could not rule out asbestos as a cause, but said the slides he viewed showed no asbestos bodies, which made him “consider this as a possibility Uof being an idiopathic mesothelioma.” He implicitly confirmed that asbestos causes almost 9 out of 10 cases of mesothelioma.
Exhibit 5 is the October 21, 2002 deposition of Dr. Paul Schwarzenberger, who said he believed plaintiff had malignant mesothelioma. He found it unlikely that she had a pleural effusion in 1997, or that if she did, that it would be related in any way to her present malignant mesothelio-ma. He said most studies support a latency period for mesothelioma of between 10 and 40 years, but that it could be less, depending on the level of asbestos exposure. With regard to plaintiff, he could not exclude exposure to asbestos when she was five years old, or exposure six years ago.
Exhibit 6 is the March 12, 2003 affidavit of Dr. Howard Sandler, president of San-dler Occupational Medicine Associates, Inc. in New York State, who was aware that plaintiff was diagnosed with mesothe-lioma in May 2002, and had worked in Plaza Tower three and one-half years, beginning in October 1998. The latency period for asbestos-induced mesothelioma is a minimum of 15 years, with the maximum exceeding 50 years. 10-20% of all mesothe-liomas are idiopathic, meaning they cannot be linked to any specific exposure or circumstances. There was no scientific evidence demonstrating that inhalation exposure to mold or mold by-products are causally related to the initiation, promotion or progression of mesothelioma. There was no evidence that any molds present in the Plaza Tower building produced any mycotoxins (mold produces mycotoxins) at appreciable levels. Dr. Sandler found that the “likely etiologic factor” for plaintiffs mesothelioma was her exposure to asbestos approximately 45 years ago during her weekly visits to her uncle’s home. Plaintiffs uncle worked at a Johns-Manville asbestos-products manufacturing plant and died of an asbestos-related disease. His Uwife was also diagnosed with an asbestos-related disease, indicating the presence of environmental or paraoccupational asbestos exposure.
Exhibit 7 consists of excerpts from the October 24, 2002 deposition of Dr. Mark Kappelman, a thoracic surgeon, who first saw plaintiff April 23, 2002 on a referral for a recurrent pleural effusion for which an etiology had not been established. He confirmed that one of the causes of pleural mesothelioma is asbestos exposure, but that there are also some unknown causes. During a May 14, 2002 thoracoscopy, he observed multiple nodules in her chest cavity, which he said is what you see most of the time with mesotheliomas. The pathology in plaintiffs case was reported as a *728 malignant mesothelioma. He said that virtually all the mesotheliomas that one sees are related to asbestos exposure, especially in “this” part of the country. He recalled plaintiffs history as being treated in 1997 for what was described as pneumonia. Dr. Kappleman talked about the latency periods for mesothelioma — 10 to 20 years, but as short a period as 5 to 10 years.
Exhibit 8 consists of excerpts from the December 10, 2002 deposition of Danny Joyce, an industrial hygienist, who believed that plaintiff, just from working in the Plaza Tower building, “certainly had exposure to asbestos as she traversed the building, went in stairwells, worked in office settings on those floors and on other floors where asbestos was present.” He said the Plaza Tower building had water problems that facilitated mold growth, and that the removal of dry materials without adequate containment measures increased the amount of spores dispersed in the air. With regard to asbestos, he said a combination of things led to asbestos insulation on steam pipes disintegrating and falling into machinery spaces, with an increased likelihood that the heating and air conditioning system would pick up and disperse asbestos fibers throughout the building. He believed there was a | ¡¡significant likelihood that the symptoms alleged by the plaintiffs, including Mrs. Songy, were caused by the mold in the Plaza Tower building.
Exhibit 9 consists of excerpts from plaintiffs October 19, 2002 deposition, in which she talked about the different places she worked, beginning with D.H. Holmes in 1969-1970. She worked for a Westinghouse distributorship in an old building at the dead end of Poydras Street, starting in 1973. She did not know if any of the places she worked in contained any type of asbestos products. She began working for the Orleans Parish District Attorney’s Office in 1986.
Exhibit 10 consists of excerpts from the January 11, 2003 deposition of Terri Lynn Smith, a legal assistant with the Orleans Parish District Attorney’s Office, which moved into the Plaza Tower building in 1998. The DA’s office occupied floors 32 and 33. She described a horrible “dirty clothes,” sweaty, wet smell in her office upon opening her door every morning. She also described a white residue that appeared daily on her desk, computer, bookcase, floor — “everywhere.” There were black spots on her ceiling tiles. Some tiles had water on them, others had fallen out.
Exhibit 11 is a Louisiana DEQ amended penalty assessment issued on July 6, 1998 to the BAHAR Development, Inc., Baha Towers Limited Partnership, Schu-man Rafizadeh and Madonna Rafizadeh, citing a number of violations involving the 11th and 15th floors of the Plaza Tower building. A June 1996 inspection revealed small piles of construction debris on the 11th floor containing fireproofing identified as asbestos containing material. Pieces of dislodged asbestos-containing building material were found on the floor around several pipes on the 15th floor. This was described as “significant asbestos contamination.” | fi Inspection of the 11th floor revealed holes in concrete that had been made using a hammer drill. The DEQ noted that the use of a hammer drill there would cause significant vibration, which in turn would cause asbestos-containing building material to be disturbed. The piles of asbestos-containing building materials were dry and had not been adequately wetted prior to and during a stripping operation. The asbestos-containing building materials had not been sealed in leak-tight transparent containers.
*729 Exhibit 12 is the March 27, 2003 affidavit of Dr. Janine Parker, a pulmonologist, who attested that she treated plaintiff on July 2, 1997 for a follow-up to pneumonia. It was Dr. Parker’s opinion, to a reasonable degree of medical certainty, that plaintiff did not have mesothelioma in 1997.
Exhibit 13 consists of excerpts from the March 25, 2003 deposition of Dr. Manuel Lopez, who stated that tests indicated plaintiff had been exposed to mold, but that there was no test that would indicate that the exposure occurred in the Plaza Tower. He also said that “most” of the exposure that she had was what one would see in “normal” individuals exposed to the “normal” environment. He agreed that some antibodies were elevated compared to the others, but that they were not “abnormal.”
Defendant BG Real Estate Services, Inc.’s (“BG”) opposition contains a number of attachments.
Exhibit 1 is BG’s trial court opposition. It contains the affidavit of Dr. Howard Sandler. The March 13, 2003 affidavit of Dr. Tim Oury is also attached. Dr. Oury’s affidavit is essentially the same as Dr. Sandler’s. David Straus, Ph.D., identified as plaintiffs expert microbiologist, stated in deposition excerpts that antibodies in an exposed person document that in fact mold exposure has occurred, |7but do not tell you anything beyond that, such as where the person was exposed. He said there was no way to track the presence of myco-toxins in human beings. He agreed that the symptoms plaintiffs complained of in the Plaza Tower were consistent with what he would expect to see upon exposure to toxic mold, but could not say with absolute certainty that exposure occurred. He said there was a “very good likelihood” that the plaintiffs were suffering from “Sick Building Syndrome,” meaning that people are ill while inside the building, but their symptoms abate upon leaving.
Exhibit 2 is defendant Evanston Insurance Co.’s response to plaintiffs listing of suggested uncontested facts, and Evans-ton’s listing of contested facts.
Exhibit 3 is the District Attorney’s trial court opposition.
Exhibit 4 is a copy of defendant United National Insurance Co.’s trial court opposition, which includes excerpts from the March 6, 2003 deposition of Dr. Michael Gray. He referred to plaintiffs possible exposure to asbestos at her uncle’s home. She reported “frequently” spending weekends there in the late 1950’s and early 1960’s. However, Dr. Gray noted that plaintiffs history was that her uncle had five children now ranging in age from 40 to 61 years, none of whom suffered from any signs of pulmonary or pleural asbestosis. Asked whether mold and mycotoxins had ever been identified as promoters of meso-thelioma, Dr. Gray said they had been identified as agents capable of compromising the immune system, the first fine against malignancy. Dr. Gray confirmed that to a reasonable medical certainty, plaintiff had been exposed to asbestos pri- or to the first time she entered the Plaza Tower building in 1998. However, he was referring to exposure a normal person of her age would have had due to “background levels of multiple mutagens,” including asbestos.
| ¡Exhibit 5 is defendant MBA, LLC’s trial court opposition, containing a March 21, 2003 affidavit by Dr. Manuel Lopez, an adjunct professor of environmental health sciences at Tulane’s School of Public Health, and a professor and chief of clinical immunology, allergy and rheumatology at Tulane Medical School. He said there was no data demonstrating that there were mycotoxins in the air at the Plaza Tower, *730 or that the molds isolated from the building were producing mycotoxins. Thus, he said that Dr. Gray’s opinion that plaintiff was exposed to significant amounts of my-cotoxins capable of affecting her immune system did not have any scientific basis. He said there was no clinical or laboratory evidence that plaintiff’s immune system was impaired by exposure to the work environment at the Plaza Tower.
Exhibit 6 is defendant Great Lakes Reinsurance (UK) PLC’s trial court opposition.
Exhibits 7 & 8 are defendant Monticello Insurance Co.’s trial court opposition and supplemental opposition, respectively, with Dr. Lopez’s affidavit attached.
Exhibit 9 consists of excerpts from an April 10, 2002 hearing in another action, in which Dr. Victor Roggli, a pathologist, testified to the standards required to link a particular asbestos exposure to a case of mesothelioma.
Exhibit 10 is excerpts from plaintiff’s October 19, 2002 deposition, in which she stated that she would visit her uncle’s home on weekends.
Exhibit 11 consists of reports by Dr. Chandrasekaran and Dr. Gray. Dr. Chan-drasekaran’s report, referencing a May 28, 2002 office visit, said there was a strong suspicion for a malignant mesothelioma. Dr. Gray’s environmental health evaluation reflects plaintiff’s history. She said her office in the Plaza Tower had 19missing and moldy ceiling tiles, a moldy floor, and that every morning there would be a white power residue on her office contents. There was “white stuff” in the stairwells. She reported that her right lung and diaphragm were removed in August 2002, and she began chemotherapy treatments in November 2002.
Defendant Clarendon America Insurance Co.’s writ opposition filed in this court contains excerpts from plaintiffs October 19, 2002 deposition, a deposition of Dr. Gray, and the December 10, 2002 deposition of Danny Joyce, the industrial hygienist. Clarendon’s opposition also contains a copy of a March 3, 2003 Times-Picayune newspaper article concerning a delayed state health department report on cancer rates near now-defunct New Orleans area businesses that might have processed asbestos-contaminated material.
Defendant Great Lakes Reinsurance (UK) PLC’s writ opposition contains its trial court opposition, with attachments (part of this trial court opposition was attached to defendant BG Real Estate Services, Inc.’s writ opposition, see supra). In excerpts from his March 6, 2003 deposition, Dr. Michael Gray said that the concern in plaintiff’s case was that the latency period of her exposure (at the Plaza Tower) from October 1998 through diagnosis in May 2002 was three and one-half years, while the literature suggests that the average latency period is 37 years. He cited a study evidencing that latency period, and an outside range of 5 to 55 years. He said part of plaintiff’s history was a spontaneous pneumothorax in 1997. He was not aware of a link between this and plaintiff’s mesothelioma. He was asked if a spontaneous pneumothorax could be a clinical manifestation of a slow-growing mesotheli-oma, and he replied that he believed “spontaneous pneumothorax can occur in the context of mesothelioma.”
ImGreat Lakes’ writ opposition also contained excerpts from Dr. Tim Oury’s January 13, 2003 deposition. He was asked about an asbestos exposure and subsequent development of mesothelioma in less than 15 years, and he replied: “Then it becomes very questionable if it is asbestos .... depending on where you put that before 15 years, it becomes more and more *731 questionable that it’s related to the asbestos exposure versus idiopathic.”

DISCUSSION

Appellate courts review the grant or denial of a motion for summary judgment de novo. Independent Fire Ins. Co. v. Sunbeam Corp., 99-2181, p. 7 (La.2/29/00), 755 So.2d 226, 230. A summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). A fact is material when its existence or nonexistence may be essential to the plaintiffs cause of action under the applicable theory of recovery; a fact is material if it potentially insures or precludes recovery, affects a litigant’s ultimate success, or determines the outcome of the legal dispute. Smith v. Our Lady of the Lake Hosp., Inc., 93-2512, p. 27 (La.7/5/94), 639 So.2d 780, 751. A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate. Id.
“[S]ummary judgment may be rendered dispositive of a particular issue.” La. C.C.P. art. 966(E). The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by La. C.C.P. art. 969. La. C.C.P. art. 966(A)(2). Summary judgments In are favored, and the summary judgment procedure shall be construed to accomplish those ends. Id. Nevertheless, despite the legislative mandate that summary judgments are now favored, factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion and all doubt must be resolved in the opponent’s favor. Willis v. Medders, 2000-2507, p. 2 (La.12/08/00), 775 So.2d 1049, 1050. A court cannot make credibility determinations on a motion for summary judgment, and must assume that all of the affiants are credible. See Independent Fire Insurance Co. v. Sunbeam Corp., 99-2181, p. 16, 755 So.2d at 236.
Plaintiff incorrectly states that a party moving for summary judgment merely has to point out an absence of factual support for one or more elements essential to the adverse party’s claim, action or defense in order to shift the burden to the nonmoving party, who then must produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. This is the applicable law only where the moving party “will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment.” La. C.C.P. art. 966(C)(2). In the instant case, plaintiff is the moving party, and bears the burden of proof at trial.
Again, plaintiff sought summary judgment finding that: (1) she has malignant mesothelioma; (2) exposure to asbestos was “a” cause of her mesothelioma; (3) she was exposed to asbestos in the Plaza Tower office building; (4) she was exposed to mold in the Plaza Tower office building; (5) her exposure to mold, mold spores and the by-products of mold spores at the Plaza Tower was a “promoter and a substantial contributing factor to her injuries;” (6) she did not l^have malignant mesothelio-ma in 1997; and (7) she had no other direct occupational exposure to asbestos except the Plaza Towers.
(1) Drs. Don Hemelt and Ronald Walsh diagnosed “probable” malignant mesothelioma. Dr. Welsh said the results were not “positive,” but made it the “most likely one at this time.” These apparently were the initial diagnoses of plaintiffs condition, made in May 2002. Dr. Chandra- *732 sekaran, an oncologist, saw plaintiff in June 2002 for possible chemotherapy and enrollment in a trial for treatment of her mesothelioma. In July 2002, Dr. William Boron referred to plaintiffs biopsy results being consistent with malignant mesotheli-oma. Dr. Tim Oury said on January 13, 2003 that, while a stain test was “not definitive for mesothelioma,” his opinion was that it was more probable than not that it was mesothelioma. Dr. Paul Schwarzen-berger said in October 2002 that he believed plaintiff had malignant mesothelio-ma. Dr. Mark Kappelman said that the multiple nodules he saw during a May 14, 2002 thorascopy of plaintiffs chest were what one saw “most of the time” with mesothelioma. Plaintiff reported that her right lung and diaphragm were removed in August 2002, and she began chemotherapy treatments in November 2002.
Defendant BR Real Estate Service, Inc. concedes in its writ opposition that that “[r]eview of the medical records strongly suggests that Ms. Songy has mesothelio-ma.” Defendant Evanston Insurance Co. admitted in its trial court opposition that plaintiff has mesothelioma.
The evidence establishs that, to a reasonable medical certainty, plaintiff has malignant mesothelioma. Therefore, we find that there is no genuine issue of material fact, and that the trial court erred in not granting the motion for summary judgment on this issue.
(2) Dr. Howard Sandler attested that some 10-20% of mesothelioma cases are idiopathic, meaning they cannot be linked to any specific exposure or circumstances. However, he also said that the “likely etiologic factor” for plaintiffs meso-thelioma was her exposure to asbestos approximately 45 years ago during her weekly visits to her uncle’s home. Dr. Mark Kappelman said that “virtually all” the mesotheliomas that one sees are related to asbestos exposure, especially in “this” part of the country. Pathologist Dr. Tim Oury said the slides of plaintiffs pathology specimens he viewed showed no asbestos bodies, which made him “consider this as a possibility of being an idiopathic mesotheli-oma.” In addition, Dr. Oury said that the further one gets from the recognized minimum 15 year latency period, it becomes more and more questionable that it’s related to the asbestos exposure versus idiopathic. There is evidence that plaintiff possibly was exposed to asbestos as a child in the late 1950’s and early 1960’s at her uncle’s home, and possibly exposed while working at the Plaza Tower building for three and one-half years, from 1998 to 2002. There is a genuine issue of material fact as to the issue of whether asbestos exposure was a cause of plaintiffs meso-thelioma.
(3) There is evidence that plaintiff and Terri Lynn Smith, another DA’s Office employee, would find white dust covering their offices at the Plaza Tower. Plaintiff also noticed white stuff in the stairwell. The La. DEQ found asbestos contaminated building products on the 11th and 15th floors of Plaza Tower in June 1996, some two years before the DA’s Office moved in. The DA’s Office was on the 32nd and 33rd floors of the building. Industrial Hygienist Danny Joyce said his inspection found asbestos contamination in mechanical areas, from disintegrating steam pipe coverings, and an “increased” “likelihood” that asbestos would be |14picked up and dispersed throughout the building by the heating and air conditioning system.
There is no direct evidence to show that plaintiff was exposed to asbestos on the 32nd or 33rd floors of Plaza Tower, or in any other place in the building. Thus, there is a genuine issue of material fact as to whether she was exposed to asbestos in the building.
(4) Dr. Manuel Lopez stated in his deposition that tests indicated that plaintiff *733 had been exposed to mold, but that there was no test that would indicate that the exposure occurred in the Plaza Tower. He also said that “most” of the exposure that she had was what one would see in “normal” individuals exposed to the “normal” environment. He agreed that some antibodies were elevated compared to the others, but that “they’re not abnormal.” Danny Joyce stated that the Plaza Tower building had water problems that facilitated mold growth, and that the removal of dry materials without adequate containment measures increased the amount of spores dispersed in the air. He said mold would grow on wet organic materials such as sheetrock and ceiling tile, that this was evidenced by his observations and the “limited” air monitoring results he had viewed. David Straus, Ph.D., identified as plaintiffs expert microbiologist, stated in deposition excerpts that antibodies in an exposed person document that in fact exposure to mold has occurred, but does not tell you anything beyond that, such as where the person was exposed. He further stated that the symptoms “plaintiffs” complained of in the Plaza Tower are consistent with what he would expect to see upon exposure to toxic mold, but could not say with absolute certainty that exposure occurred.
DA employee Terri Lynn Smith spoke of a “dirty clothes,” sweaty, wet smell in her office upon opening her door every morning, black spots on her |1Ficeiling tiles, and water on some of them. Plaintiff said that her office in the Plaza Tower had moldy ceiling tiles and a moldy floor.
Because there was no definitive finding of mold on the 32nd or 33rd floor, or in any part of the building through which plaintiff traversed or visited, there is a genuine issue of material fact as to whether she was exposed to mold at Plaza Tower.
(5) Dr. Sandler said there was no scientific evidence demonstrating that inhalation exposure to mold or mold byproducts are causally related to the initiation, promotion or progression of meso-thelioma. When Dr. Gray was asked whether mold and mycotoxins had ever been identified as promoters of mesothelio-ma, he replied that they had been identified as agents capable of compromising the immune system, the first line against malignancy.
There is a genuine issue of material fact as to whether any exposure to mold, mold spores and the by-products of mold spores at the Plaza Tower was a “promoter and a substantial contributing factor” to plaintiffs injuries.
(6) Pulmonologist Dr. Janine Parker, who treated plaintiff in July 1997 for a follow-up to pneumonia, believed that to a reasonable degree of medical certainty, plaintiff did not have mesothelioma in 1997. Dr. Paul Schwarzenberger found it unlikely that plaintiff had a pleural effusion in 1997, or that if she did, that it would be related in any way to her present malignant mesothelioma. Defendant BG cites the possibility of plaintiffs exposure to asbestos during her childhood while frequently spending weekends at the home of her uncle, a worker in a Johns-Manville plant manufacturing asbestos products, and the normal lengthy latency period for mesothelioma. The inference here is that plaintiffs 1997 lung problem, i.e., pneumonia, might have been undiagnosed meso-thelioma. Dr. Gray was asked 11fiduring a deposition if a spontaneous pneumothorax, which he said plaintiff had in 1997, could be a clinical manifestation of a slow-growing mesothelioma, and he replied that he believed “spontaneous pneumothorax can occur in the context of mesothelioma.” However, Dr. Gray also noted that plaintiffs history was that her uncle had five children now ranging in age from 40 to 61 years, none of whom suffered from any signs of pulmonary or pleural asbestosis.
*734 There is a genuine issue of material fact as to whether plaintiff had mesothelioma in 1997.
(7) Finally, there is a genuine issue of material fact as to whether plaintiff had any other direct occupational exposure to asbestos except the Plaza Towers. Plaintiff worked at a number of places and buildings, and could not say, one way or the other, whether there was asbestos in any of those buildings.
For the foregoing reasons, we grant the writ in part, and amend the judgment to grant plaintiffs motion for summary judgment on the issue that she has malignant mesothelioma. The judgment is affirmed in all other respects.

WRIT GRANTED IN PART, JUDGMENT AMENDED AND AFFIRMED AS AMENDED