Filed 11/9/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| DANA BRANCATI, | 2d Civ. No. B321616 |
| | (Super. Ct. No. 16CV03956) |
|    Plaintiff and Appellant, | (Santa Barbara County) |
| | |
| v. | ORDER MODIFYING |
| | OPINION AND DENYING |
| CACHUMA VILLAGE, LLC, | REHEARING |
| | [NO CHANGE IN |
|    Defendant and Respondent. | JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on October 16, 2023, be modified as follows:

1. On page 1, the first paragraph is deleted and the following paragraph is inserted in its place:

> Here we decide an expert is qualified to render an opinion on whether a person's exposure to mold is harmful. It is up to the trier of fact to determine the expert's credibility.

2. On page 1, line 5 of the second paragraph, the word "toxic" is deleted.

3. On page 2, line 3 of the second paragraph, the word "toxic" is deleted.

4. On page 5, the word "Toxic" is deleted from the heading "*Evidence of Toxic Mold at Brancati's Residence.*"

5. On page 5, the first sentence of the second full paragraph is changed to read: "Stachybotrys, aspergillus, and penicillium may be toxic."

6. On page 6, the word "Toxic" is deleted from the heading "*Simon's Ability as a Medical Doctor to Diagnose Toxic Mold as the Cause of Brancati's Respiratory Illness.*"

7. On page 6, line 7 of the first full paragraph, the word "toxic" is changed to "hazardous."

8. On page 6, the second sentence of the second full paragraph is changed to read:

> He was board certified in allergy and immunology and was qualified to testify about the impact of hazardous substances on Brancati's respiratory tract (*San Jose Neurospine v. Aetna Health of California, Inc.*, *supra*, 45 Cal.App.5th at p. 960); the symptoms she suffered (*Finn v. G.D. Searle & Co.*, *supra*, 35 Cal.3d at p. 704); and, as an "allergist," he could identify the symptoms consistent with mold exposure.

9. On page 7, line 2 of the second full paragraph, the word "toxic" is deleted.

10. On page 8, line 3 of the first full paragraph, the word "toxic" is changed to "harmful," and, in the same paragraph, line 6, the word "toxic" is deleted.

11. On page 9, the word "toxic" is deleted in three places: in the second, seventh, and last line of the first full paragraph.

12. On page 10, line 9 of the first full paragraph, the word "toxic" is deleted.

13. On page 11, line 2 of the last paragraph, the word "toxic" is deleted.

14. On page 18, line 1 of the first full paragraph, the word "toxic" is deleted.

There is no change in the judgment.

Respondent's petition for rehearing is denied.

GILBERT, P. J.          BALTODANO, J.          CODY, J.

Filed 10/16/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| DANA BRANCATI,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CACHUMA VILLAGE, LLC,<br><br>    Defendant and Respondent. | 2d Civ. No. B321616<br>(Super. Ct. No. 16CV03956)<br>(Santa Barbara County) |

Here we decide an expert is qualified to render an opinion on whether a person's exposure to toxic mold is harmful.

Dana Brancati, a former tenant, appeals a judgment of dismissal following the trial court's granting a motion in limine filed by defendant Cachuma Village, LLC (Cachuma), her landlord. Brancati filed a complaint for, among other things, personal injuries for exposure to toxic mold. Cachuma moved in limine to exclude Brancati's medical expert from testifying about the medical causation of her illnesses due to mold.

Because the medical expert was qualified and his opinion was based on facts and a differential diagnosis, the trial court erred in excluding his evidence. We reverse.

## FACTS

Brancati entered a month-to-month lease with Cachuma to reside in its premises. She resided there from April 2012 to April 2016. She complained to Cachuma about mold "infestation" and Cachuma's failure to correct that problem. In 2016, Insight Environmental, a company that specialized in mold testing, determined there were *high levels* of a variety of dangerous types of mold at her residence at Cachuma.

Brancati filed a complaint for breach of the warranty of habitability, fraud, constructive eviction, and personal injuries for exposure to toxic mold. She alleged that she had suffered "respiratory illnesses" because of exposure to the mold. She sought $50,000 for her injuries.

Brancati relied on the testimony of Ronald A. Simon, M.D., as her expert to prove the cause of her medical illnesses. At his deposition Simon testified that "as a result of living" in her home environment with "excess mold growth," Brancati had "a variety of adverse health effects that started fairly shortly after she moved in there."

Cachuma moved in limine to exclude Simon from testifying on causation, or, alternatively, for an Evidence Code section 402 hearing to determine admissibility. Cachuma claimed Simon was not qualified to testify on medical causation of Brancati's illnesses due to mold.

In her opposition, Brancati claimed, "Dr. Simon's testimony is not only based on both his examinations of [Brancati], but his experience and the scientific literature which establishes that exposure to damp moldy environments has negative effects on health."

At a pretrial hearing, the trial court ruled Simon was not qualified to testify on the medical causation issue. Brancati was not able to proceed to trial without Simon's testimony. The trial court dismissed this action.

## DISCUSSION

### *Standard of Review*

Where a trial court grants a motion in limine that prevents a party's expert from testifying and leads to a dismissal, we review that order for an abuse of discretion. (*Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, 677; see also *Geffcken v. D'Andrea* (2006) 137 Cal.App.4th 1298, 1311 [" 'If the court excludes expert testimony on the ground that there is no reasonable basis for the opinion, we review the exclusion of evidence under the abuse of discretion standard' "].)

Where the granting of a motion in limine "precludes an entire cause of action" or is tantamount to a nonsuit, we may also conduct our review de novo to determine whether the trial court erred as a matter of law. (*Kinda v. Carpenter* (2016) 247 Cal.App.4th 1268, 1279; *McMillin Companies, LLC v. American Safety Indemnity Co.* (2015) 233 Cal.App.4th 518, 530.)

Brancati presented evidence showing her expert is a qualified medical doctor and a scientific researcher. She was prepared to present relevant evidence on the cause of her respiratory illness. The trial court's ruling prevented her from having a trial. The court's order is not consistent with the standard courts must use to decide whether to exclude an expert from testifying.

### *Disqualifying Experts*

"Trial judges have a 'substantial "gatekeeping" responsibility' to ensure that an expert's opinion is based on both

reliable material and sound reasoning." (*Bader v. Johnson & Johnson* (2023) 86 Cal.App.5th 1094, 1104.) " 'The trial court's preliminary [or gatekeeping] determination whether the expert opinion is founded on sound logic is not a decision on its persuasiveness.' " (*Id.* at p. 1105.) " 'The court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion.' " (*Ibid.*) " 'Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture.' " (*Ibid.*) " 'The court does not resolve scientific controversies.' " (*Ibid.*)

In determining evidence of causation, the court applies a substantial factor standard. " 'The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical.' " (*Bockrath v. Aldrich Chemical Co., Inc.* (1999) 21 Cal.4th 71, 79.)

"As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." (*Bonner v. ISP Technologies, Inc.* (8th Cir. 2001) 259 F.3d 924, 929.) "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." (*Id.* at pp. 929-930.)

Medical doctors are experts who are in the best position to determine the nature of illnesses experienced by patients. (*San Jose Neurospine v. Aetna Health of California, Inc.* (2020) 45 Cal.App.5th 953, 960.)

Doctor Simon testified that Brancati's "adverse health effects" were the result of her living at the Cachuma residence where she was exposed to "excess mold growth." The trial court

4.

ruled Simon was not qualified to make a diagnosis of mold as the cause of her illnesses.  But Simon's opinion was based on facts, not on a "leap of logic or conjecture."  (*Bader v. Johnson & Johnson*, *supra*, 86 Cal.App.5th at p. 1105.)

*Evidence of Toxic Mold at Brancati's Residence*

The 2016 Insight Environmental testing report showed Brancati's residence at Cachuma showed "high levels" of "aspergillus" and "penicillium" mold growth near her shower.  Air samples from her hallway showed "*elevated levels* of Aspergillus/Penicillium and Stachybotrys mold growth."  (Italics added.)  Insight Environmental said that stachybotrys, aspergillus, and penicillium produce "fungal metabolites that may be toxic" when "inhaled."  These are the types of mold that "produce mycotoxins."  It also determined that the "mold spores" at her residence "pose *an immediate threat of occupant exposure*."  (Italics added.)  Included within that report were color photographs that showed large concentrations of mold growth in various parts of Brancati's Cachuma residence.

Stachybotrys chartarum, aspergillus, and penicillium are toxic molds.  (Jarman & Felstiner, *Mold Is Gold: But, Will it be the Next Asbestos* (2003) 30 Pepperdine L.Rev. 529, 549.)  Stachybotrys chartarum "has killed animals."  (*Id*. at p. 542.)  It is "especially harmful to small children."  (*Id*. at p. 533.)  Health professionals have linked it to sudden infant death syndrome.  (*Ibid*.)  "[E]xcessive exposure to mold has been a health issue for humans for many years."  (*Id*. at p. 534.)

*Methods to Prove Mold as the Cause of an Illness*

There are two methods used to prove mold is the cause of an illness.  An expert may testify using a "methodology generally recognized in the scientific community" to determine mold as the

cause (*B.T.N. v. Auburn Enlarged City School Dist.* (N.Y.App.Div. 2007) 845 N.Y.S.2d 614) and may rely on epidemiological studies to show a statistical link between exposure to the substance and the cause of the illness. (*Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 326.) Alternatively, a doctor who examines a patient may use a medical "differential diagnosis" to determine mold as the cause of a diagnosed illness. (*B.T.N.*, at p. 1340; see also *Cooper v. Takeda Pharmaceuticals America, Inc.* (2015) 239 Cal.App.4th 555, 586; *Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367, 1384-1385.) Here Simon, as a medical doctor and a researcher, attempted to use both methods.

*Simon's Ability as a Medical Doctor to Diagnose Toxic Mold*
*as the Cause of Brancati's Respiratory Illness*

Medical doctors who examine patients may reach the most probable diagnosis for a patient's condition through a process of elimination. (*Cottle v. Superior Court*, *supra*, 3 Cal.App.4th at pp. 1384-1385.) They are expected to identify the "source of a patient's illness" (*Finn v. G.D. Searle & Co.* (1984) 35 Cal.3d 691, 704) and diagnose "the nature of [the] disease . . . from a study of its symptoms." (*Ibid.*) Doctors may consider exposure to toxic substances as a factor causing an illness. (*Davis v. Honeywell Internat. Inc.* (2016) 245 Cal.App.4th 477, 495.)

Simon, a medical doctor, examined Brancati. He was board certified in allergy and immunology and was qualified to testify about the impact of natural toxic substances on Brancati's respiratory tract (*San Jose Neurospine v. Aetna Health of California, Inc.*, *supra*, 45 Cal.App.5th at p. 960); the symptoms she suffered (*Finn v. G.D. Searle & Co.*, *supra*, 35 Cal.3d at p. 704); and, as an "allergist," he could identify the symptoms consistent with toxic mold exposure.

6.

Simon testified that he conducted "a differential diagnosis" to determine the cause of Brancati's illness. This is a standard method doctors use to eliminate potential causes of illness to be able to reach a diagnosis. (*Cooper v. Takeda Pharmaceuticals America, Inc.*, *supra*, 239 Cal.App.4th at p. 586.) This process does not require doctors to eliminate all hypothetical causes before making a diagnosis. (*Ibid.*) A "proper differential diagnosis is adequate to support [an] expert medical opinion on causation." (*Westberry v. Gislaved Gummi AB* (4th Cir. 1999) 178 F.3d 257, 263; *Kennedy v. Collagen Corp.* (9th Cir. 1998) 161 F.3d 1226, 1230.)

Simon knew Brancati's Cachuma residence was contaminated with toxic mold. He determined that she had the typical combination of "respiratory symptoms" of mold exposure that included "nasal congestion, runny nose, coughing, sneezing," and the "exacerbation of her migraine headaches." She also was "not . . . able to sleep" due to "respiratory" illness. Simon presented evidence to show these are the symptoms that have been identified as being caused by mold exposure. "Testimony regarding objectively verifiable physical symptoms leading to a medical diagnosis is admissible as garden variety expert testimony." (*Ramona v. Superior Court* (1997) 57 Cal.App.4th 107, 121.) Medical theories of causation of illnesses are admissible when based on standard diagnostic methods. (*Roberti v. Andy's Termite & Pest Control, Inc.* (2003) 113 Cal.App.4th 893, 903.)

Simon considered the timing of Brancati's symptoms. He determined the onset of her symptoms was consistent with her time in the Cachuma residence. Brancati did not have the "respiratory tract symptoms" until she moved to Cachuma. Her

7.

symptoms "lessened when she moved out." A "temporal connection" may be a "reliable indicator of a causal relationship." (*Bonner v. ISP Technologies, Inc.*, *supra*, 259 F.3d at p. 931; *Westberry v. Gislaved Gummi AB*, *supra*, 178 F.3d at p. 265, italics added [a "temporal relationship between exposure to a substance and the onset of a disease or a worsening of symptoms can provide *compelling evidence of causation*"]; *Martin v. Chuck Hafner's Farmers' Market, Inc.* (N.Y. 2006) 814 N.Y.S.2d 442, 443-444 [evidence that respiratory illness occurred after exposure to mold supported a triable issue of fact on causation].)

Brancati resided at Cachuma for four years. The " ' "length, frequency, proximity and intensity of exposure" ' " to a toxic substance are factors "that a medical expert may rely upon in forming his or her expert medical opinion." (*Davis v. Honeywell Internat. Inc.*, *supra*, 245 Cal.App.4th at p. 495.) Here the level of exposure to the toxic molds was high and long term. Simon's determination that there was "excessive" mold is supported by the photographs in the mold testing report.

Before reaching his differential diagnosis of mold exposure, Simon prepared two medical reports where he eliminated several potential causes for Brancati's respiratory illness. He reviewed her "collateral allergic history" and found it was "totally noncontributory." He reviewed a "four page allergy, asthma and immunology review form with her." That is a standard procedure to "rule out other possible causes" in mold cases. (*New Haverford Partnership v. Stroot* (Del. 2001) 772 A.2d 792, 800.)

Simon reviewed her current symptoms and past history of symptoms. He considered her medications. He reviewed her history of "past adverse drug reactions." He considered whether her symptoms could be caused by laryngopharyngeal reflux

(LPR). But he rejected that as the cause because Brancati's symptoms "are not the most typical LPR symptoms." He considered her pre-existing conditions. He said Brancati had a "pre-existing" condition involving migraine headaches. But he determined her home environment had an *aggravating* impact on that condition because it "got much, much worse in the home" in Cachuma.

Simon determined whether Brancati would fall within the tiny percentage of people who are hypersensitive and have toxic allergic reactions to mold. He relied on a 2016 allergic skin testing report by Doctor Tubiolo who had examined Brancati. Simon concluded Brancati did not fall within that group. Brancati was normal and within the "99 percent" of the population who do not have such extreme toxic allergic reactions. In an allergy skin test report, Tubiolo found Brancati's "inhalants" included "aspergillus" and other molds. That aspergillus finding supported the conclusion that she had been breathing toxic mold.

Simon also conducted an "environmental survey." Potential causes of allergic reactions may include smoking or pet allergies. (*New Haverford Partnership v. Stroot*, *supra*, 772 A.2d at p. 800.) But Simon eliminated those causes. He reviewed Brancati's "smoking history" and found it was not relevant. He considered her history with cats and found that was not applicable in terms of allergies. He determined that she was "[n]egative for atopic disorders" and that she was physically "well developed." He decided her "pulmonary function" was "within normal limits." He found that her 2016 CT scan was, in relevant part, normal. He considered her "social history" and her "family history." He excluded exposure to outdoor mold as a cause of her

illness because outdoor mold "get[s] dissipated" by the atmosphere. That is not the case with indoor mold. Simon could reasonably make these findings to exclude a number of potential causes in order to make a diagnosis. (*Cooper v. Takeda Pharmaceuticals America, Inc.*, *supra*, 239 Cal.App.4th at p. 586; *Wendell v. GlaxoSmithKline LLC* (9th Cir. 2017) 858 F.3d 1227, 1237 ["when an expert establishes causation based on a differential diagnosis, the expert may rely on his or her clinical experience as a basis for ruling out a potential cause of the disease"].)

Simon considered the 2016 mold testing report of Brancati's residence. It indicated that mold spores there posed an immediate threat of exposure. The air testing in that report was relevant on causation. A method "typically used to prove specific causation in mold cases is air sampling." (Kanemoto, *Scientific Expert Admissibility in Mold Exposure Litigation* (2003) 26 Hawaii L.Rev. 99, 129; *New Haverford Partnership v. Stroot*, *supra*, 772 A.2d at p. 800.) The air sampling, combined with a 2016 medical report finding that she was breathing toxic mold, provided support for Simon's theory.

A medical expert may also rely on published scientific studies showing odds ratios (OR) of 2.0 or more that show a causal effect between exposure to a substance and illness symptoms. (*Johnson & Johnson Talcum Powder Cases*, *supra*, 37 Cal.App.5th at p. 326.) Simon relied on published studies. One study from Japan showed an OR of 4.36 for eye symptoms, 3.70 for nose symptoms, and 3.45 for throat and respiratory symptoms for persons living in indoor environments containing dampness and visible mold growth. (Hope & Simon, *Excess dampness and mold growth in homes: An evidence-based review of the*

*aeroirritant effect and its potential causes* (May–June 2007) 28 (No. 3) Allergy & Asthma Proceedings 264 (Hope & Simon), citing Saijo et al., *Symptoms in relation to chemicals & dampness in newly built dwellings* (2004) Internat. Archives of Occupational and Environmental Health.)  Simon could rely on such studies to properly support his diagnosis and opinion.

Cachuma's experts, who did not examine Brancati, claimed there *might* be causes for her illness other than indoor mold, such as her contact with horses.  But a 2016 allergy skin test did not show any positive finding for Brancati inhaling "horse dander."  Simon prepared a medication plan for Brancati, and, as a treating doctor, he was in the *best position* to determine the cause of her illness (*San Jose Neurospine v. Aetna Health of California, Inc.*, *supra*, 45 Cal.App.5th at p. 960) and to exclude other potential causes.  (*Wendell v. GlaxoSmithKlien LLC*, *supra*, 858 F.3d at p. 1237.)

Moreover, "[c]ausation is generally a question of fact for the jury, unless reasonable minds could not dispute the absence of causation."  (*Lombardo v. Huysentruyt* (2001) 91 Cal.App.4th 656, 666.)  Here there is a significant dispute.  (See, e.g., *Watters v. Dept. of Social Service* (La.Ct.App. 2003) 849 So.2d 724, 733 [genuine issue of material fact where in a dispute between experts, one doctor said mold was "capable of compromising the immune system"].)

As a medical doctor, Simon could rule out other causes with his differential diagnosis and reach a probable diagnosis of toxic mold exposure as the cause of Brancati's respiratory illnesses. (*Roberti v. Andy's Termite & Pest Control, Inc.*, *supra*, 113 Cal.App.4th at pp. 901-902; *Cottle v. Superior Court*, *supra*, 3 Cal.App.4th at pp. 1384-1385.)

*Simon's Ability as a Scientific Researcher to Testify about the*
*General Acceptance of His Theory in the Scientific Community*

In addition to being a medical doctor, Simon is also a scientific researcher. His experience in that area provided additional support for his differential diagnosis that exposure to mold caused Brancati's respiratory illness.

Simon researched the "aeroirritant" impact of moldy environments on health. He and another author published a peer-reviewed study on the aeroirritant effects of exposure to damp indoor environments. (Hope & Simon, *supra*, Allergy & Asthma Proceedings, at pp. 262-270.) In this published study, Simon said, "[E]pidemiological studies support the link between a damp indoor environment and mold growth with upper airway irritant symptoms." (*Id.* at p. 269.) Epidemiological studies may show a statistical correlation between exposure to a substance and the cause of an illness. (*Johnson & Johnson Talcum Powder Cases*, *supra*, 37 Cal.App.5th at p. 326.)

Scientific researchers may opine on the scientific acceptance of their theories and the epidemiological factors and studies they relied on to reach their conclusions. (*Bockrath v. Aldrich Chemical Co.*, *supra*, 21 Cal.4th at p. 79; *Johnson & Johnson Talcum Powder Cases*, *supra*, 37 Cal.App.5th at p. 326; *Centex-Rooney Construction Co., Inc. v. Martin County* (Fla. 1997) 706 So.2d 20, 26.)

The trial court cited *Geffcken v. D'Andrea*, *supra*, 137 Cal.App.4th 1298. There we held two scientific tests to link mold to illness had not achieved scientific acceptance, and an expert was not qualified to testify about a causal link between, among other things, mold and lung cancer. We noted that the plaintiffs' theory was not supported by a single peer-reviewed scientific

12.

reference and that the test results to prove causation were unreliable. There was no forensic investigation, there were chain of custody errors that invalidated the integrity of the sampling results, and samples had been inaccurately transposed. We also said our decision was fact specific and "[did] not constitute precedent for the exclusion" of evidence "under materially different factual scenarios." (*Id*. at p. 1312, fn. 4.)

Brancati does not rely on the testing or theories mentioned in *Geffcken* and she does not claim mold causes cancer. The trial court's reliance on *Geffcken* was misplaced. Our decision was not intended to prevent medical doctors who examine their patients, as here, from performing a differential diagnosis to determine and opine on the cause of the patient's illness. Moreover, as Brancati notes, there have been new scientific studies about mold that were not in existence in 2006 when we decided *Geffcken*.

*Scientific Studies on Mold and Illness*

Simon declared *recent studies* confirmed the scientific accuracy and acceptance by the scientific community of his opinion about the link between respiratory diseases and exposure to mold.

In 2016, in a statement on building dampness, mold, and health, the State Department of Public Health determined that "visible mold" or "mold odor" indicates "an *increased risk of respiratory disease* for occupants." (Environmental Health Laboratory Branch, State Dept. of Pub. Health, Statement on Building Dampness, Mold, and Health (Feb. 2016) p. 1, italics added.)

In 2011, an Environmental Health Perspectives report determined "[t]here is *sufficient evidence* of an association between indoor dampness-related factors and a *wide range of*

*respiratory* or allergic health effects." (Mendell et al., *Respiratory and Allergic Health Effects of Dampness, Mold, and Dampness-Related Agents: A Review of the Epidemiologic Evidence* (June 2011) 119 (No. 6) Environmental Health Perspectives 755, italics added.)

A World Health Organization (WHO) report in 2009 found a connection between exposure to mold and "increased prevalence[] of respiratory symptoms." (WHO guidelines for indoor air quality: dampness and mould (Jan. 2009) <http://www.who.int/publications/i/item/9789289041683> [as of Oct. 16, 2023], archived at <https://perma.cc/5SHE-7Z6M>.)

In 2017, a review in the International Journal of Hygiene and Environmental Health determined that "indoor mold growth must be considered as a potential health risk." (Hurrass et al., *Medical diagnostics for indoor mold exposure* (2017) p. 306.)

A 2004 Institute of Medicine of the National Academies report, titled "Damp Indoor Spaces and Health," concluded: 1) "There is sufficient evidence of an association between exposure to a damp indoor environment and *upper respiratory tract symptoms*," and 2) "There is sufficient evidence of an *association between the presence of 'mold' . . . in a damp indoor environment and upper respiratory tract symptoms*." (*Id.* at p. 194, italics added.)

A September 2017 report by the National Center for Environmental Health, Centers for Disease Control and Prevention, titled "Mold and Your Health," concluded that for people sensitive to molds, "molds can cause nasal stuffiness, throat irritation, coughing or wheezing, eye irritation, or, in some cases, skin irritation."

The United States Environmental Protection Agency (EPA) recently stated, "Research on mold and health effects is ongoing." (U.S. EPA, *Mold and Health* (2023) <http://www.epa.gov/mold/mold-and-health> [as of Oct. 16, 2023], archived at <https://perma.cc/YB8N-UL8J>.) But it noted, "Molds have the potential to cause health problems. Molds produce allergens (substances that can cause allergic reactions) and irritants. . . . [¶] [M]old exposure can irritate the eyes, skin, nose, throat, and lungs of both mold-allergic and non-allergic people." (*Ibid.*) "Inhaling or touching mold or mold spores may cause allergic reactions in sensitive individuals. Allergic responses include hay fever-type symptoms, such as sneezing, runny nose, red eyes, and skin rash." (*Ibid.*)

In addition to these studies, in a published article, Simon relied on additional scientific studies showing OR ratios well exceeding 2.0 for documented causal connections between exposure to damp and mold environments and various specific illness symptoms. (Hope & Simon, *supra*, Allergy & Asthma Proceedings, at pp. 264-265.) These were published studies from researchers in various countries, including Sweden, Taiwan, and Japan. (*Ibid.*) These studies used a scientific statistical method, considered similar causal factors, involved significantly large population groups, and their findings could be peer reviewed and duplicated. (*Ibid.*) Such studies, with such ratios, provided factual support for Simon's theory about the causal link between mold and respiratory illness. (*Johnson & Johnson Talcum Powder Cases*, *supra*, 37 Cal.App.5th at p. 326.)

Simon's theory about mold exposure has "support in existing data, studies or literature." (*Marsh v. Smyth* (N.Y.App.Div. 2004) 785 N.Y.S.2d 440, 446.) General acceptance

15.

"does not require unanimity, a consensus of opinion, or even majority support by the scientific community." (*People v. Leahy* (1994) 8 Cal.4th 587, 601.) The trial court may permit the introduction of " ' "competing principles or methods in the same field of expertise." ' " (*Cooper v. Takeda Pharmaceuticals America, Inc., supra,* 239 Cal.App.4th at p. 590.)

*Judicial Decisions on Mold Exposure Causing Illnesses*

Courts have found that "the scientific community *has generally accepted* the principle that a connection exists between the presence of mold and health." (*Mondelli v. Kendel Homes Corp.* (Neb. 2001) 631 N.W.2d 846, 856, italics added.) "[N]umerous publications *accepted in the scientific community*" recognize "the link between exposure to" highly "toxigenic molds" and "adverse health effects." (*Centex-Rooney Construction Co., Inc. v. Martin, supra,* 706 So.2d at p. 26, italics added.) Although courts have been cautious about linking mold to a variety of illnesses, they have recognized that studies have linked "toxic effects as a result of mold exposure . . . to upper and lower respiratory tract symptoms." (*Young v. Burton* (D.C. 2008) 567 F.Supp.2d 121, 138.)

Consequently, courts have admitted expert evidence showing the specific causal link between molds and illnesses suffered by parties. (*B.T.N. v. Auburn Enlarged City School Dist., supra,* 845 N.Y.S.2d at p. 615 [epidemiology evidence showed "atypical molds found to be present in the school building can cause plaintiffs' symptoms"]; *Martin v. Chuck Hafner's Farmers' Market, supra,* 28 A.D.3d at p. 1067; *Watters v. Dept. of Social Services, supra,* 849 So.2d at p. 733; *New Haverford Partnership v. Stroot, supra,* 772 A.2d at pp. 797, 801 [expert testimony properly admitted to show cognitive defect symptoms

16.

were the result of "exposure to atypical" mold]; *Davis v. Fisher Single Family Homes, Ltd.* (Ky.Ct.App. 2007) 231 S.W.3d 767, 779 [expert permitted to testify about the "scientifically" valid "short-term health effects of mold exposure"]; *Pauluk v. Savage* (9th Cir. 2016) 836 F.3d 1117, 1119 [doctors' depositions "corroborated that [employee] was ill and that the illness was caused by mold"]; *Caldwell v. Curioni* (Tex.Ct.App. 2004) 125 S.W.3d 784, 793 [treating doctors' affidavits stating plaintiffs' physical problems were caused "by exposure to mold infestation" were sufficient to overturn summary judgment for defendant landlord]; *Genna v. Jackson* (Mich.Ct.App. 2009) 781 N.W.2d 124, 130 [extremely high levels of mold "can cause" children's symptoms of coughing, wheezing, vomiting, lack of oxygen, nosebleeds, and diarrhea].)

The scientific acceptance of the link between molds and illness has also been part of this state's health public policy. California courts long ago found a link between mold and adverse health symptoms. (*Miller v. Lakeside Village Condominium Assn.* (1991) 1 Cal.App.4th 1611, 1634 (conc. opn. of Johnson, J.) ["Mold in the condominium was the cause of all the symptoms"].) The California Toxic Mold Protection Act of 2001 requires landlords to disclose "the presence of toxic mold." (Jarman-Felstiner, *Mold is Gold: But, Will it be the Next Asbestos*, *supra*, 30 Pepperdine L.Rev. at p. 549.) Lawmakers enacted it to "[p]rotect the public's health." (Health & Saf. Code, § 26131, subd. (a)(2).) In 2016, the Legislature added major "visible mold" growth, confirmed by health officials, as a factor in classifying a premises as "substandard." (*Id.*, § 17920.3, subd. (a)(13).) Landlords are not shielded from liability for the presence of "mold infestation on the premises." (*Burnett v. Chimney Sweep* (2004)

123 Cal.App.4th 1057, 1067.)  They must provide safe and habitable premises.  (*Knight v. Hallsthammar* (1981) 29 Cal.3d 46, 52.)

Federal courts have recognized the link between toxic mold and illness may constitute an "*obvious health*" *hazard for the public.*  They have held that: 1) because apartments contaminated with mold constitute a threat to health, they may be condemned (*Elsmere Park Club, L.P. v. Town of Elsmere* (3d Cir. 2008) 542 F.3d 412, 419); and 2) "[b]ecause removing an *obvious health hazard is a matter of safety* and not policy, the government's alleged failure to control the *accumulation of toxic mold* in the Bangor commissary cannot be protected under the discretionary function exception" to the Federal Tort Claims Act. (*Whisnant v. United States* (9th Cir. 2005) 400 F.3d 1177, 1183, italics added.)

The trial court did not consider the deposition testimony of Cachuma defense expert Marion J. Fedoruk, M.D.  Fedoruk testified, "[M]old as being considered unhealthy in a building, obviously, generally, I would agree with that, yes."  From Simon's experience, his medical diagnosis, and the recent scientific literature, he could reasonably conclude that environments with *high levels* of aspergillus and stachybotrys, as here, form "aeroirritants" that had an adverse impact on Brancati's respiratory health.

Cachuma claims that Simon's research and theories are outside the mainstream and that his theory about "aeroirritant effects" is not based on traditional scientific wisdom and cannot be used to support his testimony at trial.  But this claim has been rejected.  (*Centex-Rooney Construction Co., Inc. v. Martin County*, *supra*, 706 So.2d at p. 26.)

18.

Moreover, on a motion in limine, the trial court "does not resolve scientific controversies" and it does not weigh the opinion's "probative value." (*Bader v. Johnson & Johnson, supra,* 86 Cal.App.5th at p. 1105.) Those are matters for the jury at trial. Even if a theory involves a matter of scientific controversy, history shows new theories often replace the conventional scientific wisdom. Substances that were once thought to be harmless have later been determined to be dangerous, i.e., smoking, asbestos, lead paint, cyclamates, saccharin, Camp Lejeune drinking water, talcum powder, etc.

*Other Issues*

Cachuma claims in Simon's deposition he gave opinions about "MVOC" (microbial volatile organic compounds), but he was not an expert in that area, and he opined about a number of other factors based on speculation. Where an expert gives testimony in areas beyond his or her expertise, or provides speculation, that testimony may be excluded. (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117; *People v. Hogan* (1982) 31 Cal.3d 815, 852, overruled on another ground by *People v. Cooper* (1991) 53 Cal.3d 771.) But Cachuma's effort to completely prevent Simon from testifying in the various areas where he has expertise is unwarranted.

Cachuma contends Simon did not consider evidence of Brancati's preexisting conditions before she moved into Cachuma. Her medical records show she was treated for an "upper respiratory *infection*" in 2009. But whethe**r** that infection is a preexisting condition or contradicts Brancati's evidence on causation are matters for the trier of fact to resolve at trial.

19.

## DISPOSITION

The judgment dismissing the action and disqualifying Doctor Simon from testifying is reversed.  Costs on appeal are awarded to appellant.

<u>CERTIFIED FOR PUBLICATION.</u>


                              GILBERT, P. J.

We concur:


BALTODANO, J.


CODY, J.

Timothy J. Staffel, Judge

Superior Court County of Santa Barbara

_____

Richard I. Wideman for Plaintiff and Appellant.
Mullen & Henzell, Rafael Gonzalez and Sean Stratford-Jones for Defendant and Respondent.